MILLER-PIEHL EQUIPMENT COMPANY et al., appellants, v. GIBSON
COMMISSION COMPANY et al., appellees.

No. 48162.

(Reported in 56 N.W.2d 25)

DECEMBER 16, 1952.

Cook, Blair & Balluff, of Davenport, for appellants.

Messer, Hamilton, Cahill & Bartley, of Iowa City, and Tipton & Tipton, of Muscatine, for appellees.

OLIVER, J.—There is but one plaintiff and one defendant in this case. Plaintiff Miller-Piehl Equipment Company is a department or division of plaintiff Miller-Piehl, Inc., an automobile dealer in Davenport, Iowa. This corporation was also agent for a steel company and sold and erected metal quonset buildings for storing grain. Defendant W. C. Jack deals in livestock and operates a sales barn in West Liberty, Iowa, under the name of Gibson Commission Company.

The Production and Marketing Association is a branch of the Commodity Credit Corporation under the United States Department of Agriculture. To encourage the construction of commercial storage facilities for grain C. C. C. offered to persons who would construct warehouses a three-year contract, called Storage Guarantee Agreement, for 10c per bushel per year for grain stored therein. If grain was not stored therein the government agency guaranteed payment at the rate of 10c per bushel the first year, 9c the second year and 8c the third year, based upon 75% of 90% of capacity.

In May 1950 Mr. Branson, an agent for plaintiff, sought to sell defendant a metal quonset building, 40x140 feet, with a capacity of 53,492 bushels, for storing grain, to be erected on land owned by defendant. Branson told defendant if he would buy the building plaintiff would get defendant a three-year contract with the government for the storage of corn at 10c per bushel per year if the space was used and at 10c, 9c and 8c per year for each year if grain was not stored in the building. Branson said the building would cost about $15,000 and would pay for itself in three years. Later Mr. Branson returned with Mr. Sherden, plaintiff's sales supervisor, who had put through a number of such government contracts, and who told defendant of the Storage Guarantee Agreement, under which the government would pay storage for three years whether or not grain was stored in the warehouse.

May 31 defendant told Branson he would buy the building if plaintiff would furnish him the three-year contract. Accordingly Branson made out an order which defendant signed, directing plaintiff to ship him—"Terms $500 down—When—upon approval of appl.: 1 40x140 Special Grain Storage $8532; 8 Hatches $360; 3 Partitions $1500; Erection of Building $1960; Est. of Slab $2600." Defendant also signed an order for "1 Vac-u-vator" (a machine to handle the grain). At the same time defendant paid plaintiff $500 to apply on the order. Defendant signed also a letter to C. C. C. and blank copies of the Storage Guarantee Agreement form. The blanks were afterward filled in by Sherden. Sherden prepared an eight-page information report with various drawings of the building and the vac-u-vator and secured the signed recommendations of the Production and Marketing Association representatives at the county and state levels. He delivered these papers to the state P. M. A. office in Des Moines.

The handling of the application at the national P. M. A. office was delayed and the approved Storage Guarantee Agreement was not returned to defendant from Washington until July 30. Defendant told Sherden he had received the government letter (with the approved agreement) and that "it don't look very good to me, the building has to be done by tomorrow." The agreement and letter stated if the facility was not completed

by July 31 C. C. C. might, at its election, cancel the agreement or make sections 5 and 8 inoperative for the first year. Section 8 is the three-year guarantee section.

July 31 Sherden prepared and had defendant sign a letter to C. C. C., stating the construction of the storage facility could not be started until receipt of the approval, which had just been received, and requesting an extension of the completion date to August 15. Sherden took the letter to the office of Floyd McIntyre, Chairman of the Muscatine County P. M. A. McIntyre telephoned the state office and was told they would recommend approval of the extension. Hence, Mr. McIntyre recommended its approval and forwarded the letter to the state office.

The following day Sherden told defendant, "We have arranged for the extension and everything will be all right." Plaintiff was authorized to proceed with the building. At about that time defendant signed a contract with Gerald Hopkins for the construction of the concrete slab or floor for the building. Defendant paid Hopkins $2743 for this. August 12 Sherden told defendant the building was completed and requested payment for the building only. Defendant gave him a check for $10,392. About August 16 defendant received a letter from the State P. M. A. office advising him it had written Washington that "your guarantee be inoperative for the first year, with the second year under the guarantee beginning July 31, 1951." Defendant immediately stopped payment on the $10,392 check and notified Mr. Sherden. Mr. Sherden said he would take the letter "to the P. M. A. office to get the thing straightened out." The next day Mr. Sherden returned to West Liberty and told defendant everything was all right, all straightened out and he would like to put the check through. Sherden testified defendant said in substance: "You can put it through whenever I am satisfied I have my three-year storage contract."

September 20 defendant wrote plaintiff: "The grain bin I bought of you exactly three months and 20 days ago is no nearer a contract than when I bought it. * * * I will have to have a guarantee on my contract by money or some way or no corn is going into it by me. Someone had better get on the ball."

Defendant testified he had never used the building or equipment and that the building was still standing on the concrete

slab to which it was bolted and from which it could be removed by plaintiff at any time.

Plaintiff filed a mechanic's lien October 2 and later another mechanic's lien. This action was instituted about November 4.

Defendant pleaded that because of plaintiff's failure to procure the Storage Guarantee Agreement he elected to rescind the contract and have the building and fixtures removed from his land and returned to plaintiff. He asked for a decree requiring the removal of the building, concrete slab and equipment. He counterclaimed for $500 paid on the purchase price and for $2743 paid for the slab, and prayed for general equitable relief.

I. Plaintiff concedes there was an agreement the building should not be erected until the "approval" by the federal agency of the application for the Storage Guarantee Agreement was received. The order signed by defendant indicates this. However, plaintiff contends a new contract or a modification of the original agreement, changing this condition, was made between July 31 and August 2. The trial court found the record did not support this contention. We agree with that finding. Sherden had handled all the negotiations in connection with the application for the Storage Guarantee Agreement. Defendant merely signed letters and instruments prepared by Sherden and placed before defendant and served as addressee for incoming mail.

About August 1, when Sherden called at the P. M. A. office in Muscatine relative to the application for an extension of time, Floyd McIntyre, the officer in charge, telephoned the state office and was told it would recommend approval of the application for extension of time. Then, at Sherden's request, McIntyre telephoned defendant. McIntyre testified:

"That morning was the first time we had found out that the contract was inactive for the first year and I asked Mike [defendant] if he still wanted to go along with it. As I remember he stated that if the contract still held he would. By the contract, I mean the three-year storage agreement."

Defendant's version is substantially the same—"Floyd, if you still need the storage and I can have a three-year contract I will still take it." On cross-examination Sherden testified:

"After I was in Muscatine I went back to West Liberty and told Mr. Jack that this extension of time had been arranged for. * * * Q. And he would still have his three-year storage contract? A. To the best of my knowledge it was true. Q. When you told him that, you knew it hadn't yet been approved by the C. C. C. in Washington? A. I assumed when the two P. M. A. authorities said it would be the way it was done, because they had always followed their recommendations. Q. In other words, you were assuming then when you told Mr. Jack this? A. That is right."

After this conversation defendant erected the building. Apparently it was practically completed about eleven days later when defendant handed Sherden the check for $10,392. Defendant stopped payment on this when he was advised by the state P. M. A. the "guarantee [would] be inoperative for the first year." When Sherden again told him everything was "all straightened out" defendant said plaintiff could put the check through "whenever I am satisfied I have my three-year storage contract." September 20 he wrote plaintiff refusing to proceed without a guarantee "by money or some way" and demanding action.

The record does not show defendant ever waived or consented to a modification of the condition relative to the three-year guarantee. On the contrary, it clearly shows his consistent refusal to proceed without a guarantee.

II. Plaintiff states 39,292 bushels of corn were available to defendant's facility, the storage fees for which would have exceeded the guarantee for the first year. Hence, it contends the first year's guarantee was an academic feature of the contract. This contention overlooks the elements of time and enforceability. Were the contention sound, defendant could have been given the guarantee he demanded in his letter of September 20, without expense or liability to plaintiff. Hence, it could be argued plaintiff's failure to act then does not comport with the contention it makes now.

No one could forecast how much corn would be available for storage until the 1950 corn was picked in the late months of that year. McIntyre, the P. M. A. representative, testified the P. M. A.

did not need any additional space in that county for the 1949 corn and although it appeared in the early part of the summer they would need considerable space for storage, they could not tell what the farmers might do, "possibly it might all be delivered and there might not any of it be delivered." By the time the case was tried in the spring of 1951 McIntyre had learned 19,242 bushels of corn would have been available for storage in that county. Neither McIntyre nor any other person knew this in August or September 1950. Defendant was offered no enforceable agreement covering 19,242 bushels. Nor was there any such as to the other 20,000 bushels counted by plaintiff. McIntyre testified merely that the chairman of Johnson County told him they had about that amount available. McIntyre testified also: "I don't recall having any conversation with Mr. Jack about guaranteeing any certain number of bushels or storage or whether or not the P. M. A. would guarantee any."

The guarantee for the first year was a real and substantial condition to defendant's contract to buy the quonset building. Defendant could not be required to exchange it for unenforceable expectations even though such expectations might later have been realized.

III. The performance of the oral agreement to secure the three-year Storage Guarantee Agreement was a condition precedent to defendant's liability on the contract for the quonset building. In Cavanagh v. Iowa Beer Co., 136 Iowa 236, 242, 113 N.W. 856, 858, a tenant was sued for breach of contract of lease of a building which the landlord had constructed for him. The tenant pleaded he had rescinded the lease, averring the landlord had failed to perform an oral agreement, which was the inducement for the lease, to procure from the city council a consent to the operation by the tenant of a saloon upon the premises, and the lease never became a valid or binding instrument. The court held the pleading "on its face clearly shows the nonperformance of a condition precedent to the taking effect of the lease."

See also 12 Am. Jur., Contracts, section 296; 17 C. J. S., Contracts, section 338, page 792 et seq.

IV. Plaintiff has appealed from the adjudication it failed to establish its claim against defendant and the correlated ad-

judication that defendant was entitled to recover the sum of $500 which it had paid plaintiff upon the contract. As already stated, the securing by plaintiff of the three-year Storage Guarantee Agreement was a condition precedent to defendant's obligation. The failure of the condition precedent to occur discharged defendant's contractual duty. Hence, the denial of plaintiff's claim and the allowance of the $500 counterclaim were correct.

V. Defendant has appealed from the part of the judgment denying recovery on his counterclaim for $2743 paid by him for leveling the ground and constructing the slab of the quonset building. The opinion of the distinguished trial court states this claim is bottomed upon the theory that the original contract required plaintiff to do this work but that at a later date the work was done by Mr. Hopkins and was paid for by defendant at plaintiff's request. The court found plaintiff was not required to furnish the slab under the original contract and that defendant acted independently of plaintiff in contracting for its construction and plaintiff did not agree to reimburse defendant therefor.

It will be noted the original order prepared by Mr. Branson and signed by defendant contained the item "Est. of Slab $2600." Assuming the slab was not to be furnished by plaintiff it is clear the contract recognized it to be an essential part of the building and contemplated expense should be incurred in constructing it. A purchaser who has rightfully rescinded such a contract may demand the complete restoration of the status quo which includes the return of any expenditure made by him which was contemplated by the contract. Granette Products Co. v. Neumann & Co., 200 Iowa 572, 579, 203 N.W. 935, 937, 205 N.W. 205, states:

"The general rule is that one who elects to rescind a contract cannot recover damages as for its breach. But where the contract contemplates the furnishing of material for a particular purpose, as the erection of a structure, and the purchaser expends money in attempting to so use it, and later rescinds the contract because of the failure of the material to comply with the contract, he is entitled to be put *in statu quo;* and this includes the recovery of not only the money he has paid under the contract, but also

the reasonable expense he was put to in attempting to use the material for the contemplated purpose."

In Lake v. Western Silo Co., 177 Iowa 735, 739, 158 N.W. 673, the purchaser of a silo who rescinded was permitted to recover the expense of erecting it, the cause for rescission not appearing until the erection was almost complete. To the same effect are: United Engine Co. v. Junis, 196 Iowa 914, 917, 195 N.W. 606 (installation of power and lighting machinery) and International Harvester Co. v. Tjentland, 181 Iowa 940, 947, 165 N.W. 180 (farm machinery). See also Wernli v. Collins, 87 Iowa 548, 551, 54 N.W. 365.

Under the rule of the foregoing authorities defendant is entitled to recover $2743 with interest on this item of his counterclaim. We conclude the pleaded facts and circumstances and prayer for relief are sufficient to permit such recovery. The record does not show the value to the property of the cement slab, without the building. However, its removal would probably entail considerable expense. We do not believe plaintiff should be required to undergo that expense. Hence, it should be permitted to elect whether it will remove the slab. On defendant's appeal the judgment is reversed and remanded for judgment in accordance herewith.—Affirmed on plaintiff's appeal; reversed and remanded on defendant's appeal.

All JUSTICES concur.