**UTICA MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**The STOCKDALE AGENCY, Stockdale Bancorporation, Jerry Stockdale, and Ray Bryan, Defendants.**

**No. C 95–4010.**

United States District Court, N.D. Iowa, Western Division.

July 10, 1995.

Walter J. Andrews of Wiley, Rein & Fielding, Washington, DC, and John D. Mayne of Mayne & Mayne, Sioux City, IA, for plaintiff Utica.

Michael L. Zenor and Michael J. Houchine of Zenor & Carr Law Office, Spencer, IA, for Stockdale defendants.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ...................1183
II. STANDARDS FOR SUMMARY JUDGMENT ............................1184
III. FINDINGS OF FACT .........................................1186
 A. Undisputed Facts .......................................1186
 B. Disputed Facts .........................................1188
IV. LEGAL ANALYSIS ...........................................1189
 A. The Nature Of Utica's Cause Of Action .................1189
 1. Actions founded on fraudulent misrepresentation .....1190
 2. Utica's cause of action .............................1192

 B. Fraudulent Misrepresentation At Law And In Equity.....................1192
 1. Elements of fraudulent misrepresentation ...........................1192
 a. Material, false representation .....................................1194
 b. Intent ........................................................1195
 c. Reliance ......................................................1195
 2. Burden of proof................................................1196
 3. Remedies for fraudulent misrepresentation ..........................1197
 a. Remedies at law ..............................................1197
 b. Equitable remedies ...........................................1197
 C. Utica's Claim For Rescission .......................................1198
 1. Two meanings of rescission .....................................1198
 2. Precondition ...................................................1199
 3. Utica's right to summary judgment of rescission......................1200
 i. Representation ..............................................1200
 ii. Falsity .....................................................1200
 iii. Materiality..................................................1203
 iv. Intent to induce Utica to contract .............................1205
 v. Reliance ...................................................1205
 V. CONCLUSION .....................................................1205

This lawsuit for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201–2202, presents the unusual circumstance that the parties do not even agree on the nature of the cause of action asserted by the plaintiff. The plaintiff insurer asserts that its cause of action is for rescission of contracts for errors or omissions insurance for three policy years, alleging as grounds for rescission that the defendant insured, an insurance agency, made misrepresentations in the applications for insurance. The defendant insured, on the other hand, asserts that the insurer's cause of action is for fraudulent misrepresentation, and that rescission is a possible remedy.

This disagreement between the parties on the nature of the plaintiff's cause of action has repercussions for the court's disposition of the insurer's motion for partial summary judgment. The insurer asserts that its right to rescission may be decided as a matter of law on the sole issue of whether or not a question in its application form was ambiguous. The insurer argues that the question was clear and unambiguous, and that the insured's answer was therefore false and fraudulent. The insurance agency argues that even if the application question was not ambiguous, and therefore its answer was false, there are genuine issues of material fact on other elements of a claim of fraudulent misrepresentation precluding summary grant of the relief requested by the plaintiff.

The parties' disagreement over the elements that must be proved is only a reflection of the arcane, obscure, and confusing nature of Iowa law on the issue. The court therefore sympathizes with the parties' attempts to frame cogent arguments. After painstaking research, which would not have been necessary had Iowa law been clearer, this court has discovered that, historically, Iowa courts have recognized four distinct actions based on fraud, each with differing elements or differing effect on the rights of the parties involved. Thus, the court must determine the nature of this plaintiff's action founded on fraud and precisely what elements the plaintiff must prove in order to obtain rescission of the insurance contracts. This federal court will therefore attempt to illuminate for itself and the parties some abstruse points of the applicable state law in order to dispose of the plaintiff's motion for partial summary judgment.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Utica Mutual Insurance Company (Utica) filed this lawsuit for declaratory judgment pursuant to 28 U.S.C. § 2201 on February 10, 1995. Utica is an insurance company incorporated under the laws of New York with its principal place of business in Utica, New York. Utica's business includes underwriting liability insurance. Defendants in this action are the Stockdale Agency and Stockdale Bancorporation, both Iowa corporations with their principal place of business

in Okoboji, Iowa; Jerry Stockdale, an owner of the two Stockdale entities and a resident of Iowa; and Ray Bryan, a South Carolina resident who was formerly the president of the Stockdale Agency and is still an owner of some percentage of the Stockdale Agency's stock.[1] Defendants are collectively referred to in this opinion as "Stockdale," unless the conduct of a specific defendant is discussed.

The complaint seeks declaratory judgment that three errors and omissions insurance policies Utica provided to Stockdale covering insurance years from 1992 to 1995 may be rescinded and are null, void, and of no effect. Utica alleges that the basis for rescission of each of the policies is false statements made by Stockdale in the applications for the policies. In addition to rescission of the policies, Utica seeks a declaration that it has no obligations to provide Stockdale with any indemnity or defense in connection with a claim against Stockdale made by the Aspen Lodge, reimbursement for all costs incurred in defense of the Aspen Lodge claim, an award of costs in this action, and such other relief as the court deems just and proper.

Stockdale answered the complaint on February 24, 1995, denying Utica's entitlement to any relief, and including a counterclaim against Utica. Stockdale moved for leave to file an amended and substituted answer and counterclaim on March 17, 1995. Chief Magistrate Judge John A. Jarvey granted Stockdale's motion on April 13, 1995. Stockdale's amended counterclaim seeks declaratory judgment that Stockdale has performed all obligations under the policies of insurance issued by Utica, and that Utica is therefore required to maintain the insurance coverage in question, including paying and defending all claims, and providing all automatic and optional extended coverage under the polices. Utica denies Stockdale's right to relief on its counterclaim.

On March 7, 1995, prior to the filing of Stockdale's amended answer and counterclaim, Utica moved for partial summary

judgment as to the latest renewal of the errors and omissions policy for the 1994–1995 period. Stockdale resisted the motion for partial summary judgment on March 17, 1995, requested a hearing on the motion, and moved to continue disposition of the motion for partial summary judgment to allow for discovery on a number of issues. Following a status conference on May 22, 1995, this court withdrew the referral of dispositive motions in this matter to the magistrate judge, if there in fact was one, set a briefing schedule on the motion for partial summary judgment, and set the motion down for hearing on July 7, 1995. The hearing was subsequently rescheduled for June 30, 1995.

At the hearing on Utica's motion for partial summary judgment, Utica was represented by counsel Walter J. Andrews of Wiley, Rein & Fielding in Washington, D.C., and John D. Mayne of Mayne & Mayne in Sioux City, Iowa. Stockdale was represented by counsel Michael L. Zenor and Michael J. Houchine of Zenor & Carr Law Office in Spencer, Iowa. The oral arguments in this matter were ably and courteously presented by counsel and did much to clarify, although not to resolve, the dispute between the parties as to the nature of the plaintiff's cause of action and the basis on which this motion must be resolved. This matter is now fully submitted, and the court turns to disposition of Utica's motion for partial summary judgment by first considering the standards applicable to such a motion.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from [triers of fact]." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine,

---

**1.** Utica asserts diversity jurisdiction pursuant to 28 U.S.C. § 1332, and proper venue pursuant to 28 U.S.C. § 1391(a). The parties have both cast their arguments in terms of Iowa law, and therefore do not dispute that Iowa law is applicable to

disposition of this matter, although neither party has pointed to any choice of law provisions in the insurance policies or otherwise identified the basis for this choice of Iowa law.

triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

■ The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[2] A court considering a motion for summary

judgment must view all the facts in the light most favorable to the nonmoving party, here Stockdale, and give Stockdale the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■ Procedurally, the moving party, here Utica, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). Utica is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

■ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, Stockdale is therefore required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied

2. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 1072, 106 S.Ct. 798, 832, 88 L.Ed.2d 774, 804 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Stockdale, as the nonmoving party, fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then Utica is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of Utica's motion for partial

summary judgment. The court must first determine what facts are undisputed and which are indeed in dispute.

## III. FINDINGS OF FACT

### A. Undisputed Facts

Stockdale is an insurance agency that sold, as a large share of its business, insurance policies for hotels and motels. Utica has provided errors and omissions liability insurance coverage for the Stockdale Agency since the 1960s. The only insurance policy at issue in this motion for partial summary judgment, however, is the renewal of Stockdale's errors and omissions coverage with Utica for the policy year of November 3, 1994, to November 3, 1995.

In recent years, Stockdale did approximately 50% to 60% of its business, measured by premium value, by writing policies for Global Insurance Company, S.A. (Global), which is a company operating from and possibly incorporated in Uruguay. However, just prior to applying for the renewal policy with Utica at issue here, Stockdale's business with Global dropped to approximately 1% of its total business, and the renewal application so indicates. At the time of the renewal application, Stockdale had in fact severed all relationship with Global and was actively attempting to terminate all policies it had written with Global.

The change in Stockdale's business resulted from the issuance by the Commissioner of Insurance of the State of Texas of a Cease and Desist Order on August 4, 1995, which was effective immediately, against "GLOBAL INSURANCE COMPANY S.A. AND MAX WALDEN DBA HOSPITALITY INSURANCE AGENCY INC AND RAY BRYAN DBA THE STOCKDALE AGENCY AND DAVID J MILLER DBA WINMILL INTERNATIONAL INC." The Cease and Desist Order effectively ordered these respondents to cease and desist doing any insurance business in the state of Texas. The Cease and Desist Order stated the following at its conclusion:

IN THE EVENT THIS ORDER IS VIOLATED, THE COMMISSIONER MAY

IMPOSE A CIVIL PENALTY OF $25,-000.00 FOR EACH ACT OF VIOLATION, OR DIRECT THE PERSON AGAINST WHOM THE ORDER IS ISSUED TO MAKE COMPLETE RESTITUTION, IN THE FORM AND AMOUNT AND WITHIN THE PERIOD DETERMINED BY THE COMMISSIONER, TO ALL TEXAS RESIDENTS, TEXAS INSURERS, AND ENTITIES OPERATING IN TEXAS DAMAGED BY THE VIOLATION OR FAILURE TO COMPLY, OR IMPOSE BOTH THE PENALTY AND DIRECT RESTITUTION.

The Cease and Desist Order indicates that it was issued upon a "verified application for an ex parte Emergency Cease and Desist Order" by the Texas Department of Insurance, and states that the Department alleged that the named respondents "have been committing unfair or deceptive acts or practices by selling and/or issuing fraudulent, false, or suspect insurance and/or engaging in the business of insurance in an unauthorized manner in the State of Texas" and that, "unless Respondents are immediately ordered to cease and desist from selling and/or issuing fraudulent, false, or suspect insurance and/or engaging in the business of insurance in an unauthorized manner in the State of Texas ..., Respondents will continue to commit such unfair or deceptive acts or practices and/or engage in the business of insurance in Texas in an unauthorized manner." The Commissioner found that the respondents were unauthorized persons engaging in the business of insurance in violation of Texas law and that such conduct "constitutes an imminent peril to the public welfare" pursuant to Texas law "and should immediately be stopped and enjoined."

The parties do not dispute that Stockdale immediately complied with the Texas Cease and Desist Order by terminating any business in Texas, reevaluating its business relationship with Global, taking steps to cancel all Global polices, and ceasing to write Global policies. Nor do they dispute that the Texas Department of Insurance took no further action against Stockdale in light of Stockdale's immediate compliance with the Cease and Desist Order.

On October 3, 1994, Stockdale applied for renewal of its errors and omissions policy with Utica to become effective November 3, 1994. The application was signed by Stockdale Agency President Ray Bryan. Among the questions on the renewal application were several concerning the applicant and its business since the previous year's application, including the following:

15. Have there been any fines or disciplinary action, including license suspension, taken against you, your employees, or your associates by any insurance regulatory agency?

The renewal application contains no further definition or explanation of the kinds of disciplinary action contemplated, apart from fines and license suspensions. In response to this question, Bryan marked the response box to indicate Stockdale's answer was "no." In a box above the signature line was a warning as follows:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or submits a claim containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

In a paragraph also just above the signature line, the renewal application bears the following declaration:

I/WE HEREBY DECLARE that the above statements and particulars are true to the best of our knowledge, and that I/we have not suppressed or misstated any material facts and I/we agree that this application shall be the basis of the contract with the Utica Mutual Insurance Company, New Hartford, NY, and deemed a part thereof. It is also acknowledged that the applicant is obligated to report any changes that occur after the date of signature, but prior to the effective date of coverage.

Utica renewed Stockdale's errors and omissions coverage for the 1994–1995 year. However, upon learning of the Cease and Desist Order against Stockdale by the Insurance Commissioner of the State of Texas,

Utica filed the complaint in this action.[3] Utica's complaint asserts in part that in answering "no" to the question concerning disciplinary action, Stockdale filed an application for insurance containing an intentional misrepresentation. That misrepresentation, Utica alleges, entitles Utica to rescission of the 1994–1995 policy. Utica now asserts that it is entitled to summary judgment as a matter of law on the ground that Stockdale's statement that it had been subject to no disciplinary action was a material misrepresentation in response to an unambiguous question in the application for insurance, and therefore Utica is entitled to summary, declaratory judgment that it may rescind the 1994–1995 errors and omissions policy.

### B. Disputed Facts

Contrary to Utica's assertion that it is entitled to declaratory judgment as a matter of law that it may rescind the 1994–1995 policy, Stockdale alleges a great many issues of fact that it asserts are material to the disposition of Utica's claim for relief as to the 1994–1995 policy, thus making partial summary judgment as to that policy inappropriate. Stockdale asserts that there is at least a genuine issue of material fact as to whether its statement that it had not been subject to any disciplinary action was false. Stockdale alleges that the term "disciplinary action" is ambiguous, and that a Cease and Desist Order with which it complied, and which resulted in no further action by the issuing authority because of that compliance, was not a "disciplinary action." Stockdale points to the deposition testimony of Utica's underwriter who renewed Stockdale's policy as supporting its assertions, because that underwriter was unable to define the meaning of "disciplinary action" with any precision.[4]

Stockdale alleges that even if its response on the application for renewal of insurance was indeed false, there is a genuine issue of material fact as to whether Stockdale or Bryan knew it was false or recklessly disregarded its falsity. Bryan asserted in his deposition testimony that he did not believe, and does not now believe, that the Cease and Desist Order constituted "disciplinary action," and that no disciplinary action was ever taken against Stockdale, because Stockdale complied with the order. Because he did not believe the statement was untrue, Bryan asserts further that he had no intention of misleading Utica in making it.

Stockdale devotes a substantial portion of its resistance to attempting to establish that even if the statement was false, it was not material to Utica's renewal of the policy. Stockdale's evidence in support of this contention focuses on what it asserts is Utica's leniency[5] in renewing existing policies. Stockdale has presented evidence that of the 10,000 to 11,000 renewal applications received by Utica each year, only a few dozen are denied. Further, Stockdale points to deposition testimony of Utica underwriters that they could not recall having denied a renewal on the ground of "disciplinary action"; rather, the most frequent ground for non-renewal was claims during the previous year. Final-

---

3. At oral arguments, the court asked whether Utica had also tendered back any premiums it had received for the errors and omissions policy for 1994–1995. The parties agreed that Utica had done so, although Stockdale had refused to accept the return of its premium payments. The parties agreed that there was currently no dispute as to whether the premiums returned had been in the proper amount, because Stockdale had not rejected them on that basis. The parties also agreed that the return of the premiums by Utica was accompanied by a statement from Utica to the effect that it was rescinding the policy in question here, although that document does not form part of the summary judgment record.

4. Utica counters that its representatives' definitions were remarkably consistent. One under-writer, Delores Evans, the underwriter who actually approved renewal of Stockdale's policy, defined "disciplinary action" as "an action that the state regulatory agency takes upon an agency that is engaging in an improper act." Curt Pearsall, another representative of Utica, defined "disciplinary action" as "where the agency or agent or agency [sic] has done something that is against insurance regulation." The court finds that these definitions are indeed consistent, but far from illuminating. The definitions either do not identify the action taken, or in what respect it is "disciplinary," as opposed to "regulatory," or both.

5. Stockdale consistently refers to Utica's "sloppiness."

ly, Stockdale points to the deposition testimony of the underwriter who renewed Stockdale's policy to the effect that she did not know what action she would have taken had Stockdale answered "yes" to the "disciplinary action" question, and that she would not automatically have denied the renewal application. This underwriter testified that she might have requested more information before making a renewal decision. She testified that she does not know if she would have denied the renewal even if she had had the information about the Texas Cease and Desist Order she now has.

Stockdale also argues that there is another genuine issue as to materiality, and presumably as to whether the representation in question, if false and material, caused Utica any damage, because under the terms of its existing policies, Stockdale is entitled to purchase a "tail," which would have provided coverage identical to that provided by the renewal policy, covering the entire period for which any Global policies sold by Stockdale remained in force.

Stockdale also alleges that the answer to the "disciplinary action" question was not relied on by Utica in making its renewal decision. Stockdale again points to evidence that Utica's renewal procedures are extremely lenient. Stockdale points to the after-the-fact assertion by Utica that they did not know that they were writing a policy for an agent selling "surplus lines" insurance from a poorly-rated company, but compares this statement to notes by a Utica underwriter on Stockdale's 1992 renewal application that state "Requested financial for Global INS— only one listed in Best is not licensed in IA and is only XS [excess] and surplus?" Thus, Stockdale asserts, Utica had questions about the financial stability of and lines of insurance sold by Global, and even some question about what "Global" company was involved, in prior years, but still renewed Stockdale's coverage when it was doing 50% to 60% of its business with that company. Stockdale asserts that, when asked by Utica, it provided all the financial information about Global it had. Stockdale points out that this information would have shown that Utica was in fact looking at the "wrong" Global insurance company, not the "off-shore" company with which Stockdale was doing business. Stockdale asserts that Utica never questioned the identity of the company, and now claims never to have known about information obvious from materials supplied to Utica by Stockdale, including the facts that Global was an "off-shore," "surplus lines" carrier with no "Best rating." The court will consider in the pertinent place whether any of the disputes of fact pressed by Stockdale creates a genuine issue of *material* fact. *See Fed.R.Civ.P.* 56(c); *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56; *Hartnagel,* 953 F.2d at 396.

## IV. LEGAL ANALYSIS

Before the court may determine whether Utica is entitled to partial summary judgment on its cause of action as to the 1994–1995 insurance policy, the court must first determine what that cause of action is. Once the court has determined what Utica's cause of action is, the court may then determine what the elements of such a cause of action are, what remedy or remedies are available upon proof of the elements of that cause of action, whether there is a genuine issue of material fact as to the elements of the cause of action, and what relief, if any, Utica is entitled to at the current stage of the proceedings.

### A. The Nature Of Utica's Cause Of Action

Utica's complaint is clear, and the parties do not dispute, that Utica has filed an action seeking declaratory judgment pursuant to 28 U.S.C. § 2201.[6] Utica's complaint describes

---

**6.** Declaratory judgment actions are authorized by a provision of the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides, in pertinent part, that:

(a) In a case of actual controversy within its jurisdiction, except [in circumstances not present here], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

its "cause of action" as one for "declaratory judgment for rescission of the policy." The complaint seeks as relief, *inter alia,* "declaratory judgment that the polices issued by Utica covering the 1992–1995 period are hereby rescinded and are null and void and of no effect." The basis for rescission is alleged misrepresentations in applications for the three insurance policies in question. What is not clear, and the point on which the parties disagree, is what Utica must prove to obtain declaratory judgment in its favor.

Throughout its brief and oral arguments, Stockdale has argued that Utica's complaint alleges fraudulent misrepresentation, and that, because there are genuine issues of material fact on the elements of such a claim, as defined under Iowa law, Utica is not entitled to the rescission of the 1994–1995 policy. Thus, Stockdale characterizes Utica's cause of action as one alleging fraudulent misrepresentation, and characterizes rescission as the relief requested should the court find fraudulent misrepresentation under Iowa common law. However, at oral arguments, counsel for Utica, in answer to a question from the court, stated that Utica's action is not a claim of fraudulent misrepresentation, but "a claim for rescission." Utica asserts different standards apply to a showing of fraudulent misrepresentation as grounds for rescission, particularly when the misrepresentation is in an application for insurance, from what is required to establish a right to damages for fraud at common law. Although there is some truth to the arguments of both parties, neither has framed the question presented to the court under Iowa law entirely accurately. Because allegations of fraudulent misrepresentation are at the very heart of this matter, the court begins by examining the actions to which fraudulent misrepresentation in the inducement to contract may give rise under Iowa law.

### 1. *Actions founded on fraudulent misrepresentation*

■ Careful examination of Iowa cases demonstrates that fraudulent misrepresenta-

tion in the inducement to contract gives rise to at least three distinct actions, two of which are "at law" and one of which is "in equity." *See, e.g., In re Estate of Lorimor,* 216 N.W.2d 349, 353 (Iowa 1974) (fraud may "constitute[ ] an element of a cause of action or of an affirmative defense or is a foundation of a right sought to be established"). First, and by far the most common action based on fraudulent misrepresentation, is a *cause of action* "at law" for money damages caused to the plaintiff by the fraudulent inducement to contract. *See, e.g., Nassen v. National States Ins. Co.,* 494 N.W.2d 231, 236–37 (Iowa 1992) (action at law for damages by plaintiff insured alleging, *inter alia,* fraudulent misrepresentation by insurer of the insured's prior health condition used by the insurer as grounds for rescinding coverage), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *Eldred v. McGladrey, Hendrickson & Pullen,* 468 N.W.2d 218, 219–20 (Iowa 1991) (suit for damages by investors against accountancy firm for allegedly misrepresenting financial condition of investment firm, thus allegedly inducing investors to invest); *Bates v. Allied Mutual Ins. Co.,* 467 N.W.2d 255, 260 (Iowa 1991) (action for damages for fraudulent misrepresentation leading to settlement agreement that was later rescinded); *Air Host Cedar Rapids v. Cedar Rapids Airport Comm'n,* 464 N.W.2d 450, 453–54 (Iowa 1990) (suit for damages for fraudulent misrepresentations in negotiations that ultimately failed to result in a contract between the parties); *Sinnard v. Roach,* 414 N.W.2d 100, 104–07 (Iowa 1987) (action for damages for fraudulent misrepresentation leading to entry into mortgage contracts); *Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 567–68 (Iowa 1987) (action at law for damages for fraudulent misrepresentation leading to franchise agreement coupled with action in equity for rescission of franchise agreement); *Cornell v. Wunschel,* 408 N.W.2d 369, 373–80 (Iowa 1987) (action for damages for fraudu-

28 U.S.C. § 2201(a). Beyond declaration of rights and other legal relations, the Declaratory Judgment Act provides, that

[f]urther necessary or proper relief based on a declaratory judgment or decree may be grant-

ed, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202.

lent misrepresentation in negotiations leading to contract to purchase motel); *Kristerin Dev. Co. v. Granson Investment*, 394 N.W.2d 325, 332 (Iowa 1986) (suit for damages for fraudulent misrepresentation inducing plaintiff to enter into a contract for sale of an apartment building); *Clinton Land Co. v. M/S Assocs., Inc.*, 340 N.W.2d 232, 235–36 (Iowa 1983) (suit for damages based on fraudulent misrepresentations inducing plaintiff to contract); *Lockard v. Carson*, 287 N.W.2d 871, 873–74 (Iowa 1980) (suit for damages for fraudulently misrepresenting water purity on property in contract for purchase of property); *Lungren v. Lamoni Provision Co.*, 248 Iowa 887, 82 N.W.2d 749, 754–55 (1957) ("A party who has entered into a contract which it is claimed was fraudulent may institute an action at law to recover the consideration paid by giving notice of his decision to rescind the contract and restore the claimed offending party to his or its original position," and entertaining such an action); *Citizens Sav. Bank v. Wild*, 512 N.W.2d 799, 801–802 (Iowa Ct.App.1993) (counterclaim for damages based on fraudulent misrepresentation in plaintiff's foreclosure action); *Irons v. Community State Bank*, 461 N.W.2d 849, 851, 853–58 (Iowa Ct.App.1990) (suit at law for damages for fraudulent misrepresentation inducing plaintiff to enter into financial contracts with bank, coupled with equity action to the court seeking rescission or cancellation of note and security documents); *Hagan v. Liberty Loan Corp.*, 423 N.W.2d 886, 888 (Iowa Ct.App. 1988) (action for damages for fraudulent misrepresentation based on alteration of a quitclaim deed inducing contract for purchase of land); *see also Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1237 (8th Cir.1987) (applying Iowa law to action for damages based on fraudulent misrepresentation), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

Second, fraudulent misrepresentation in the inducement to contract may be raised as a *defense* to a breach of contract claim. *See, e.g., Higgins v. Blue Cross of Western Iowa and South Dakota*, 319 N.W.2d 232, 236 (Iowa 1982) (insurer raised fraudulent misrepresentation by plaintiff of her health condition on application form as defense in breach of contract action); *In re Estate of Lorimor*, 216 N.W.2d at 353 (fraud may "constitute[ ] . . . an affirmative defense").

Third, fraudulent misrepresentation may be pleaded as *grounds for rescission* of a contract in an action in equity. *Sinnard*, 414 N.W.2d at 107 (the court sat in equity simultaneously with the law action, and sitting in equity, cancelled the mortgage and assignment of equity in question on the basis of fraudulent misrepresentations, but the Supreme Court set aside that cancellation for lack of evidence of fraud); *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 567–68 (Iowa 1987) (action at law for damages for fraudulent misrepresentation leading to franchise agreement coupled with action at equity for rescission of franchise agreement); *Midwest Management Corp. v. Stephens*, 291 N.W.2d 896, 906 (Iowa 1980) (fraudulent misrepresentation asserted as ground for "common-law right" to void or rescind contract, but claim was denied for lack of an allegation of fraud); *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 291–93 (Iowa 1975) (distinguishing between action in equity for rescission of contract based on fraudulent misrepresentation and action at law for damages for fraudulent misrepresentation, and entertaining the former); *In re Estate of Lorimor*, 216 N.W.2d 349, 353 (Iowa 1974) (making the same distinction, but finding no fraud pleaded); *First Nat'l Bank in Lenox v. Brown*, 181 N.W.2d 178, 181–184 (Iowa 1970) (making the same distinction in an action in equity to void or rescind a contract); *Detrick v. Aetna Casualty and Surety Co.*, 158 N.W.2d 99, 105–106 (Iowa 1968) (distinguishing between elements and proof of fraud in equity and in law and the remedies flowing from each kind of fraud action, but finding no fraud established by either standard requiring any kind of relief); *Test v. Heaberlin*, 254 Iowa 521, 118 N.W.2d 73, 75 (1962) (action in equity to rescind contract for fraud); *Rosenberg v. Mississippi Valley Construction Co.*, 252 Iowa 483, 106 N.W.2d 78, 79–80 (1961) (rescission of a contract may be granted in equity on the proof of fraud in the inducement); *New York Life Ins. Co. v. Rotman*, 231 Iowa 1249, 3 N.W.2d 603 (1942) (action in equity by insurer to cancel or rescind por-

tions of insurance policies founded on alleged fraudulent misrepresentation of insured's health condition in application for insurance); *Irons v. Community State Bank*, 461 N.W.2d 849, 851, 853–58 (Iowa Ct.App.1990) (suit at law for damages for fraudulent misrepresentation inducing plaintiff to enter into financing contracts with bank, coupled with equity action to the court seeking rescission or cancellation of note and security documents); *Smith v. Peterson*, 282 N.W.2d 761, 764–67 (Iowa Ct.App.1979) (distinguishing between actions at law for fraudulent misrepresentation and action in equity to rescind contract for fraud, and entertaining the latter).[7]

### 2. Utica's cause of action

It is the third kind of action based on fraudulent misrepresentation identified above that is presented here. Utica's complaint demonstrates that it seeks rescission, in the first instance, rather than damages, on the grounds that Stockdale made fraudulent misrepresentations in its applications for insurance. *See, e.g., Robinson*, 412 N.W.2d at 567–68; *Wilden Clinic, Inc.*, 229 N.W.2d at 291–93. In such an action, it is apparent that rescission is the *remedy* sought by the plaintiff as the result of the defendant's fraudulent misrepresentation inducing plaintiff to contract, just as damages is the remedy

sought in an action at law. *See, e.g., Montgomery Properties Corp. v. Economy Forms Corp.*, 305 N.W.2d 470, 474 (Iowa 1981) (finding court was not required to determine whether party's proper remedy for fraud inducing plaintiff to enter into contract was rescission, because party wanted contract reformed, which the court found was impermissible); *Detrick*, 158 N.W.2d at 106 (remedies for fraud in equity are "frequently more beneficial" and may go beyond the rules of law); *Maytag Company v. Alward*, 253 Iowa 455, 112 N.W.2d 654, 660 (1962) (rescission in equity is a form of relief or remedy which may be granted, *inter alia*, for fraud in the inducement to contract). This conclusion as to the nature of Utica's cause of action will be made clearer in the following section distinguishing between actions based on fraudulent misrepresentation brought at law or in equity.

### B. Fraudulent Misrepresentation At Law And In Equity

### 1. Elements of fraudulent misrepresentation

The elements a plaintiff must prove to prevail on a claim of fraudulent misrepresentation in a law action in Iowa are the following: "(1) a material (2) false (3) representation coupled with (4) scienter and (5) intent

---

7. A fourth action founded on fraudulent misrepresentation is assertion of equitable estoppel barring relief to a party who seeks to recover on breach of contract. *See, e.g., Hawkeye Land Co. v. Iowa Power & Light*, 497 N.W.2d 480, 486 (Iowa Ct.App.1993). In *Hawkeye Land Co.*, the Iowa Court of Appeals considered whether sufficient evidence supported the trial court's conclusion that the plaintiff was equitably estopped from recovering unpaid rent due from the defendant under the terms of a lease. *Id.* The appellate court identified the nature and elements of an equitable estoppel claim as follows:

Equitable estoppel is a doctrine invoked to avoid injustice. *Bricker v. Maytag Co.*, 450 N.W.2d 839, 841 (Iowa 1990). The elements of equitable estoppel are as follows:
1. A false representation or concealment of material facts;
2. A lack of knowledge of the true facts on the part of the actor;
3. The intention that it be acted upon; and
4. Reliance thereon by the party to whom made, to his or her prejudice and injury.
*Id.* (citing *Fernandez v. Iowa Dep't of Human Servs.*, 375 N.W.2d 701, 708 (Iowa 1985).

*Hawkeye Land Co.*, 497 N.W.2d at 486. The court found that substantial evidence supported the district court's finding that the plaintiff was equitably estopped from seeking the unpaid rent as the result of misrepresentations. *Id.* at 487. Thus, this action or claim founded on fraudulent misrepresentation is analogous to, but not the same as, the use of fraudulent misrepresentation as a defense in a breach of contract action at law.

In one case identified by the court, "rescission" was also described as an "equitable defense to a contract action." *Clayburg v. Whitt*, 171 N.W.2d 623, 626 (Iowa 1969) (citing *Binkholder v. Carpenter*, 260 Iowa 1297, 1302, 152 N.W.2d 593 (1967)). However, the discussion in *Clayburg* clarifies that the rescission in that case was claimed to have occurred prior to the alleged breach of contract, *i.e.*, there was no contract to breach if it had already been rescinded, and the alleged rescission raised as a defense was founded not on fraudulent misrepresentation, but on mutual mistake. *Id.*

to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *Bates,* 467 N.W.2d at 260 (citing *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987), which in turn cites *Hall v. Wright,* 261 Iowa 758, 766, 156 N.W.2d 661, 666 (Iowa 1968), and also citing *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981)); *Air Host Cedar Rapids,* 464 N.W.2d at 453 (telescoping the first three elements and stating the "intent" element differently, hence: "(1) a material misrepresentation; (2) made knowingly; (3) with intent to induce the plaintiff to act or refrain from acting; (4) upon which the plaintiff justifiably relies; and (5) damages," citing *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1237 (8th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988)); *Sinnard,* 414 N.W.2d at 105; *Robinson,* 412 N.W.2d at 565 (listing the elements in slightly different order as "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage," citing *Cornell*); *Cornell,* 408 N.W.2d at 374 (listing same elements, citing *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976)); *Kristerin Dev. Co.,* 394 N.W.2d at 332 (listing the elements as in *Air Host Cedar Rapids,* citing *Beeck v. Aquaslide 'N' Dive Corp.,* 350 N.W.2d 149, 155 (Iowa 1984)); *Beeck,* 350 N.W.2d at 155 (listing elements as in *Kristerin,* and quoting a prior decision in a related case, *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981)); *Wild,* 512 N.W.2d at 802 (citing *Irons*); *see also Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1237 (8th Cir.1987) (applying Iowa law and stating the factors as quoted in *Air Host Cedar Rapids*), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

However, Iowa courts have repeatedly stated that the elements of fraudulent misrepresentation the plaintiff must prove in equity to obtain relief are somewhat different from those that must be proved in order to recover damages at law. As compared to the seven elements that must be proved at law, equity may grant relief absent a showing of scienter or pecuniary damages. *Wilden Clinic, Inc.,* 229 N.W.2d at 292; *In re Estate of Lorimor,* 216 N.W.2d at 353 ("[P]roof essential to establish fraud in law and in equity is distinguishable in that scienter is not an essential element to constitute fraud in equity."); *First Nat'l Bank in Lenox,* 181 N.W.2d at 181; *Peterson,* 282 N.W.2d at 766 (citing *Wilden Clinic, Inc.*). Thus, the court in *Wilden Clinic, Inc.,* defined the elements of fraudulent misrepresentation in equity as follows: "(1) a representation, (2) falsity, (3) materiality, (4) intent to deceive, (5) reliance." *Wilden Clinic, Inc.,* 229 N.W.2d at 292; *but see Rosenberg,* 106 N.W.2d at 80 (in an equity action, the court stated, "Where there is clear, satisfactory, and convincing evidence that the representations made are false, and known by the person making them to be false, and made with the intent to deceive the purchaser, a right to rescind the contract of purchase is sustained.").[8] This court turns, then, to further explication of each of the elements common to proof of fraudulent misrepresentation in Iowa actions in both law and equity.[9]

---

8. In an attempt to explain the difference between proof of fraudulent misrepresentation at law and in equity, the Iowa Supreme Court, quoting from 37 Am.Jur.2d, Fraud and Deceit, § 326, noted that

> "although whatever amounts to fraud according to the legal conception is also fraud in the equitable conception, the converse of this statement is not true. The equitable theory of fraud is much more comprehensive than that of law and contains elements entirely different from any which enter into the legal notion. Equity may construct a fraud from the circumstances, whereas the law must find it as a fact."

*Detrick,* 158 N.W.2d at 106. To Stockdale's extensive arguments that all seven elements of fraud at law must be proved, the court therefore

responds that proof of all seven elements of fraudulent misrepresentation would be *sufficient* to establish Utica's right to rescission, but proof of all seven is not a *necessary* condition, while proof of fraud according to the five elements required in an equity action would be *necessary* in an action at law, but not *sufficient.*

To put this matter in a different light, it may be *equitable* to grant relief in the form of a rescission of contract, based on an absence of scienter and damages, but it would be inappropriate to grant damages, which are only available in a law action, if harm can be shown to result from the knowing misconduct of the defendant.

9. One of the elements the plaintiff in an equity action need not prove, but a plaintiff at law must, is damages. The *Bates* decision is instructive on this element of a fraudulent misrepresentation

#### a. Material, false representation

The Iowa Supreme Court clarified the meaning of the first three elements of fraud in either equity or law proceedings in *Sinnard*, 414 N.W.2d at 105. The court observed, first, that "[t]he three elements ... are a (1) material (2) representation that is (3) false," and that they are "frequently treated as a single element and referred to as fraudulent misrepresentation." *Sinnard*, 414 N.W.2d at 105; *Cf. Air Host Cedar Rapids*, 464 N.W.2d at 453 (telescoping the first three elements as "a material misrepresentation"); *Kristerin Dev. Co.*, 394 N.W.2d at 332; *Beeck*, 350 N.W.2d at 155 (same); *Kapalis*, 302 N.W.2d at 94; *see also Ryko Mfg. Co.*, 823 F.2d at 1237 (same). The court next noted that "[a] representation need not be an affirmative misstatement; it can arise as easily from a failure to disclose material facts." *Id.* (citing *Cornell*, 408 N.W.2d at 374). The court stated that to be actionable, the misrepresentation must " 'relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.' " *Id.* (quoting *Wilden Clinic, Inc.*, 229 N.W.2d at 293, and also citing *Cornell*, 408 N.W.2d at 374).

Similarly, in *Cornell*, the Iowa Supreme Court considered defendant's proffered paraphrase of several of the elements of the fraud or fraudulent misrepresentation claim as an "affirmative misstatement of fact by defendant[ ] calculated to induce [the plaintiff] to enter into [a contract or agreement]." *Cornell*, 408 N.W.2d at 374. However, the court found that either "[c]oncealment of or failure to disclose a material fact can constitute fraud in Iowa.... To be actionable, the concealment must be by a party under a duty to communicate the concealed fact." *Id.* (citations omitted).[10]

▪ In both law and equity, a false representation must be "material" to be actionable. *Wilden Clinic, Inc.*, 229 N.W.2d at 292 (" 'To recover in an equity action on grounds of fraud one fundamental rule is that the alleged fraud must be material,' " quoting *Rosenberg*, 252 Iowa at 486, 106 N.W.2d at 80). A fact is material if it substantially affects the interest of the party alleged to have been defrauded. *Id.* Thus, materiality has been found where a fact influences a person to enter into a transaction, where it deceives that person or induces that person to act, or where the transaction would not have occurred without it. *Id.* at 286; *First National Bank of Lenox*, 181 N.W.2d at 182; *Rosenberg*, 252 Iowa at 486, 106 N.W.2d at 80; *Peterson*, 282 N.W.2d at 765 (citing *Wilden Clinic, Inc.*); *see also O'Rieley v. Endicott–Johnson Corp.*, 297 F.2d 1, 5 (8th Cir. 1961) (applying Iowa law, the court, in comments relevant to both the "reliance" and "materiality" elements, noted that misrepresentations must be such that " 'but for them the contract or deal would not have been made,' " quoting *Rorem v. Pederson*, 199 Iowa 304, 201 N.W. 784, 786 (1925)).

claim at law: the court held that the damage must be "a cost involved in dealing with the defrauded party." *Bates*, 467 N.W.2d at 260–61. The court held further that damages for fraud do not include damages for emotional distress, because "fraud is an economic tort which only protects pecuniary losses." *Id.* at 260 (quoting *Walsh v. Ingersoll–Rand Co.*, 656 F.2d 367, 370 (8th Cir.1981), in turn citing Restatement (Second) of Torts § 549 (1977)).

10. The court in *Cornell* also considered the "scienter" requirement for proof of fraud at law. The court stated that "[s]cienter requires a showing that alleged false representations were made with knowledge that they were false." *Id.* at 375 (citing *B & B Asphalt Co.*, 242 N.W.2d at 284). Similarly, in *Hagan v. Liberty Loan Corp.*, 423 N.W.2d 886 (Iowa Ct.App.1988), the Iowa Court of Appeals approved jury instructions on the "scienter" element of a fraudulent misrepresentation claim that stated that "the representation was made with scienter, that is, with knowledge of its falsity." *Hagan*, 423 N.W.2d at 888. The court also approved an instruction on the "intent to deceive" element which stated that "[a] result is intended if the maker ... acts in reckless disregard of whether his representation is true or false," and "[a] false statement ... when recklessly asserted, is evidence of intent to deceive." *Id.* Similarly, the Eighth Circuit Court of Appeals, applying Iowa law, stated that " 'scienter may be proved by showing ... that the special situation or means of knowledge of the representer were such as to make it his duty to know as to the truth or falsity of the representation.' " *O'Rieley v. Endicott–Johnson Corp.*, 297 F.2d 1, 7 (8th Cir.1961) (quoting *Boysen v. Petersen*, 203 Iowa 1073, 211 N.W. 894, 897 (1927)).

### b. Intent

The court finds the "intent" element of fraudulent misrepresentation formulated in terms of "intent to deceive" troubling when, in an equity action, there is no requirement to prove scienter of the person making the representation. *Wilden Clinic, Inc.,* 229 N.W.2d at 292; *In re Estate of Lorimor,* 216 N.W.2d at 353 ("[P]roof essential to establish fraud in law and in equity is distinguishable in that scienter is not an essential element to constitute fraud in equity."); *First Nat'l Bank in Lenox,* 181 N.W.2d at 181; *Peterson,* 282 N.W.2d at 766 (citing *Wilden Clinic, Inc.*). Logically, one cannot intend to deceive another by making a misrepresentation if one has no knowledge or reckless disregard of falsity of the representation. Indeed, the Iowa Court of Appeals approved an instruction on "intent to deceive" that demonstrates the interrelationship of scienter as to falsity and intent to deceive. *Hagan,* 423 N.W.2d at 888 (approving an instruction on the "intent to deceive" element which stated that "[a] result is intended if the maker ... acts in reckless disregard of whether his representation is true or false," and "[a] false statement ... when recklessly asserted, is evidence of intent to deceive."), *and compare Cornell,* 408 N.W.2d at 375 (defining "scienter" as follows: "[s]cienter requires a showing that alleged false representations were made with knowledge that they were false."). Yet, the "intent" element is often stated as "intent to deceive" even in equity actions. *See, e.g., Wilden Clinic, Inc.,* 229 N.W.2d at 292.

However, although the intent element is most often stated in terms of intent to deceive, it is in several cases stated as an "intent to induce the plaintiff to act or refrain from acting." *Air Host Cedar Rapids,* 464 N.W.2d at 453 (this formulation of intent element); *Kristerin,* 394 N.W.2d at 332 (same); *Beeck,* 350 N.W.2d at 155 (same); *Kapalis,* 302 N.W.2d at 94; *see also Ryko Mfg. Co.,* 823 F.2d at 1237 (same). In this court's opinion, such a formulation of the "intent" element is proper in an equity ac-

tion, because knowledge of falsity is not at issue, but whether misrepresentations induced the complaining party to contract is at issue.

■ Consequently, the court finds that the proper elements the complaining party must prove in order to establish a right to equitable relief for fraudulent misrepresentation are as follows: (1) a representation, (2) falsity, (3) materiality, (4) intent to induce the plaintiff to act or refrain from acting, (5) reliance. *Cf. Wilden Clinic, Inc.,* 229 N.W.2d at 292. The court therefore turns to the last of these elements, reliance.

### c. Reliance

In *Eldred v. McGladrey, Hendrickson & Pullen,* 468 N.W.2d 218 (Iowa 1991), the Iowa Supreme Court considered in some detail the "reliance" element of a tortious misrepresentation claim. Plaintiffs asserted fraudulent, negligent, or innocent misrepresentation by an accounting firm concerning the financial condition of an investment company. *Eldred,* 468 N.W.2d at 219. The court, citing the Restatement (Second) of Torts §§ 537, 552, and 552C (1977), found that reliance is "[a]n essential element" of a plaintiff's misrepresentation claim. *Id.* In *Eldred,* the plaintiffs conceded that "they never actually saw or read" the materials containing the alleged misrepresentation, but that the state had, and the state had relied upon them, and that the plaintiffs had in turn relied on the state. *Id.* The court observed that "privity is not required, [but] all three of plaintiffs' misrepresentation theories require that the plaintiffs justifiably rely to their detriment on some misrepresentation." *Id.* at 219–220 (citing Restatement (Second) of Torts §§ 537, 552, 552C, and *Pahre v. Auditor of State,* 422 N.W.2d 178, 180–81 (Iowa 1988)). The court pointed out that this was "not a case in which reliance may be inferred, as the plaintiffs concede they never saw [the materials containing the alleged misrepresentations] nor were any misrepresentations concerning its contents ever made to them." *Id.* at 220.[11] Similarly, in a deci-

---

11. In addition to rejecting an argument that reliance may be inferred when the evidence shows that the plaintiff never actually saw the materials

containing the alleged misrepresentation, the court in *Eldred* also rejected a "sort of vicarious reliance," where some other third person relies

sion of the Eighth Circuit Court of Appeals applying Iowa law, the court found that where there was no evidence that the complaining party relied on the alleged misstatements of the other party, the complaining party was not entitled to rescission on the ground of misrepresentations. *Rochholz v. Farrar,* 547 F.2d 63, 66 (8th Cir.1976); *see also O'Rieley v. Endicott–Johnson Corp.,* 297 F.2d 1, 5 (8th Cir.1961) (applying Iowa law, the court noted that "It is not necessary that the false representations be the sole inducement; it is sufficient if it is shown that 'they were relied upon to some extent, and but for them the contract or deal would not have been made,'" quoting *Rorem v. Pederson,* 199 Iowa 304, 201 N.W. 784, 786 (1925)).

The sufficiency of evidence on the reliance element troubled the Iowa Supreme Court in *Air Host Cedar Rapids,* 464 N.W.2d at 454. The court noted that the plaintiff was deceived only in negotiations that did not lead to a binding contract, and there was little indication of what the plaintiff would have done had misrepresentations not been made. *Air Host Cedar Rapids,* 464 N.W.2d at 454. However, the court found that there was sufficient evidence that the plaintiff had relied on the misrepresentations to the extent that it had been deterred from pursuing the contract, rather than relying on them to enter into a contract, and therefore the district court properly submitted the claim to the jury. *Id.* Thus, *Air Host Cedar Rapids* can be read as holding that the reliance element is shown where there is evidence that the plaintiff relied on the misrepresentation in making its ultimate determination of whether *or not* to enter into a contract. This two-sided quality of the reliance factor seems to this court to mirror the two-sided quality of the "intent" factor, which is that the defendant act "with intent to induce the plaintiff to act *or* refrain from acting." *See, e.g., Air Host Cedar Rapids,* 464 N.W.2d at 453 (this formulation of intent element; emphasis added); *Kristerin,* 394 N.W.2d at 332 (same); *Beeck,* 350 N.W.2d at 155 (same); *Kapalis,* 302 N.W.2d at 94; *see also Ryko Mfg. Co.,* 823 F.2d at 1237 (same).

As a final observation concerning this element, Iowa courts have stated that the reliance must be "justifiable." *Kapalis,* 302 N.W.2d at 94; *Irons,* 461 N.W.2d at 853 (citing *Kapalis*). Even in an arms-length transaction, a party may rely on an opposing party to disclose matters of which the opposing party has superior knowledge resulting from inequality of condition or knowledge between the parties. *Peterson,* 282 N.W.2d at 767 (citing *Wilden Clinic, Inc.,* 229 N.W.2d at 293; *First Nat'l Bank in Lenox,* 181 N.W.2d at 184).

### 2. Burden of proof

In an action at law, the plaintiff has the burden to establish fraudulent misrepresentation by clear, satisfactory, and convincing evidence. *Bates,* 467 N.W.2d at 260; *Robinson,* 412 N.W.2d at 565; *Cornell,* 408 N.W.2d at 374; *Lockard v. Carson,* 287 N.W.2d 871, 874 (Iowa 1980); *Wild,* 512 N.W.2d at 802; *Irons,* 461 N.W.2d at 854; *see also Higgins,* 319 N.W.2d at 237 (same burden applies to proof of affirmative defense of fraudulent misrepresentation). As the Iowa Supreme Court has observed,

> Stated otherwise, plaintiffs must establish their case by a preponderance of the evidence that is clear, satisfactory, and convincing. *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976). The purpose of that standard is to give deference to the presumption of fair dealing. *Mills [County State Bank v. Fisher],* 282 N.W.2d [712] at 715 [ (Iowa 1979) ]; *Hall v. Wright,* 261 Iowa 758, 767, 156 N.W.2d 661, 667 (Iowa 1968).

*Lockard,* 287 N.W.2d at 874 (specifically rejecting a mere "preponderance" standard); *see also Bates,* 467 N.W.2d at 260 (stating the standard as "preponderance of clear, satisfactory and convincing evidence"); *Robinson,* 412 N.W.2d at 565 (same); *Irons,* 461 N.W.2d at 854 (same).

There is some debate raised by the applicable cases, however, as to whether or

on the alleged misrepresentation, and the plaintiff may have relied on that third party, but the third party never makes specific assurances to

the plaintiff based on the alleged misrepresentation. *Eldred,* 468 N.W.2d at 220.

not fraud in equity must be proved to this same standard. In *Wilden Clinic, Inc.,* for example, the court attempted to clarify the differences between proof of fraud at law and in equity:

> "Fraud cannot be presumed [in law actions] but must be affirmatively proved by the one who relies on it either for the purpose of defense or attack. It must be established by a preponderance of the evidence by proof that is clear, satisfactory and convincing—such as to overcome the presumption in favor of fair dealing."
> * * *
> Where fraud is alleged in cases of equity, however, the rules are not so strict. "Fraud may there be constructed from circumstances, whereas the law must find it as a fact.["] * * *
> "Fraud may arise from facts and circumstances, and an *intent* to defraud may properly be inferred from circumstances, words, and actions shown in evidence."

*Wilden Clinic, Inc.,* 229 N.W.2d at 292 (internal citations omitted). The decisions of Iowa courts are consistent, however, that in equity, fraud may be shown from surrounding circumstances. *Wilden Clinic, Inc.,* 229 N.W.2d at 292; *First Nat'l Bank in Lenox,* 181 N.W.2d at 181; *Peterson,* 282 N.W.2d at 766 (citing *Wilden Clinic, Inc.*). In *Peterson,* the court of appeals found that both inducement and reliance could be inferred from evidence, including statements of defendants, that the defendants, not highly educated people and inexperienced in business matters, entered into the contract based on the information provided by the plaintiff sellers that misrepresented the status of condemnation of and loss of access to the property being sold. *Peterson,* 282 N.W.2d at 766.

### 3. Remedies for fraudulent misrepresentation

#### a. Remedies at law

■ Ordinarily, a successful plaintiff in a fraud action at law may only recover the benefit-of-the-bargain plus consequential damages, but may, under certain circumstances, obtain instead out-of-pocket expenses. *Bates,* 467 N.W.2d at 260; *Robinson,* 412 N.W.2d at 567; *Cornell,* 408 N.W.2d

at 380. The Iowa Supreme Court has stated that

> [t]he purpose of this rule is to put the defrauded party in the same financial position they would have been in had the fraudulent misrepresentations been true. [*Cornell,* 408 N.W.2d at 380]. However, if application of the benefit-of-the-bargain rule fails to make the plaintiff whole, out-of-pocket expenses become the measure of damages. *Id.; Robinson v. Perpetual Serv. Corp.,* 412 N.W.2d 562, 567 (Iowa 1987)....
>
> Under the out-of-pocket rule, a defrauded party is to be compensated for the amount the party lost through dealing with the defrauding party when it is apparent that no dealing would have occurred if the facts had been disclosed. *Cornell,* 408 N.W.2d at 381. This rule simply does not apply to the present case. Plaintiff was made whole by the actions of the defendants shortly after the alleged fraud.

*Bates,* 467 N.W.2d at 260; *see also Cornell,* 408 N.W.2d at 380 (also considering the appropriate application of either the "benefit-of-the-bargain plus consequential damages" rule and the "out-of-pocket" rule). The reason the plaintiff had already been made whole in *Bates,* however, is that the settlement agreement based on the asserted fraudulent statements had already been rescinded, and another settlement agreement had been entered into by the parties. *Id.* The court in *Bates* contrasted this result with the situation in which a party complains in equity of fraudulent misrepresentations that had induced the party to enter into a contract. *Id.* (citing *Test v. Heaberlin,* 254 Iowa 521, 118 N.W.2d 73 (1962)).

#### b. Equitable remedies

The Iowa Supreme Court has recognized that, in an equity case, "[a]s a general rule, fraudulent misrepresentations leading to the creation of a contract give rise to a right of rescission." *Robinson,* 412 N.W.2d at 568 (citing *Midwest Management Corp. v. Stephens,* 291 N.W.2d 896, 906 (Iowa 1980); *Maytag Co. v. Alward,* 253 Iowa 455, 464–66, 112 N.W.2d 654, 659–60 (1962)); *First Nat'l Bank in Lenox,* 181 N.W.2d at 182 ("It is a

well settled principle of equity that misrepresentations amounting to fraud in the inducement of a contract, whether innocent or not, give rise to a right of avoidance on the part of the defrauded party."). That is not the extent of the remedies available in equity, however:

> Parties seeking rescission are entitled to restitution for expenses incurred under the contract, but as a result of the election to rescind ordinarily cannot also recover contract damages. *Maytag,* 253 Iowa at 464–66, 112 N.W.2d at 659–60; *Miller–Piehl Equip. Co. v. Gibson Comm'n Co.,* 244 Iowa 103, 110, 56 N.W.2d 25, 29 (1952).

*Robinson,* 412 N.W.2d at 568.

In an earlier decision, the Iowa Supreme Court attempted to explain the differences between equity actions and law actions in terms of the remedies available:

> "Unfortunately in some of the cases for rescission in equity language is used from which it might be inferred that precisely the same principles govern in suits in equity that are applied to determine the right of the party to sue at law.... [When] a court of equity grants rescission or cancellation, its decree wipes out the instrument, and renders it as though it does not exist. Moreover, while a court of equity entertains a suit for the express purpose of procuring a contract of conveyance to be cancelled and renders a decree conferring in terms that exact relief, a court of law entertains an action for the recovery of possession of chattels, or, under some circumstances, for the recovery of land, or for the recovery of damages, and although nothing is said concerning it either in the pleadings or in the judgment, a contract or conveyance, as the case may be, is virtually rescinded; the recovery is based on the facts of such rescission and could not have been granted unless the rescission had taken place."

*Binkholder v. Carpenter,* 260 Iowa 1297, 1302, 152 N.W.2d 593, 596 (1967) (quoting 12 C.J.S. Cancellation of Instruments § 5, p. 945.).

■ These decisions make clear that rescission is essentially an equitable remedy for fraudulent misrepresentation, but that it must be obtained by making a claim for rescission in equity and proving the fraud, including proof of the five elements identified above by the standard stated above. This is the nature of Utica's "claim for rescission" or "cause of action for rescission" here.

### C. *Utica's Claim For Rescission*

#### 1. *Two meanings of rescission*

The Iowa Supreme Court has identified two meanings of "rescission" under contract law:

> 'Rescission', as used in connection with the cancellation or termination of contracts, has two connotations. A contract may be rescinded by the acts of one of the parties and does not require court action except such action at law as may be necessary to restore the status quo. 17A C.J.S. Contracts, §§ 434, 438. Rescission may also be effected by a suit in equity seeking to have the court declare a rescission and restore the status quo. The methods are analogous, but not the same. Both are governed by equitable principles. 17A C.J.S. Contracts § 413, p. 504; 13 Am. Jur.2d 496, Cancellation of Instruments, § 1.

*Binkholder,* 260 Iowa at 1302, 152 N.W.2d at 596; *see also Smith v. Peterson,* 282 N.W.2d 761, 764 (Iowa Ct.App.1979) (quoting *Binkholder,* and observing that in the case before it, "The second method was accomplished when the [defendant] counterclaimed, asking the court in equity to declare a rescission and restore the status quo.").

In *Binkholder,* the court found that it had previously recognized these two meanings of rescission in *Butler Mfg. Co. v. Elliott & Cox,* 211 Iowa 1068, 1071–72, 233 N.W. 669 (1931), in which the court said

> Rescission is the unmaking of the contract. Rescission may be accomplished by acts *in pais,* as well as through resort to the court of equity.

*Binkholder,* 152 N.W.2d at 597. Utica has resorted to the court for the second kind of rescission. Such a claim for rescission of a contract "by a court in equity is directed to the sound discretion of th[e] court exercised

in the light of general equitable principles." *Id.* at 598.

### 2. Precondition

■ The first kind of rescission identified by the Iowa courts in *Binkholder* and *Peterson,* rescission by the party, is a precondition for obtaining the equitable relief Utica seeks. In *Test v. Heaberlin,* 254 Iowa 521, 118 N.W.2d 73 (1962), the Iowa Supreme Court considered that an agreement procured by the fraud of one of the parties may be rescinded under proper conditions. *Test,* 254 Iowa at 524–25, 118 N.W.2d at 75. However, a contract obtained by fraud is "not on that account void *but merely voidable* at [the defrauded party's] option." *Id.* at 524, 118 N.W.2d at 75 (emphasis added). The court then described the conditions under which the defrauded party may void, or rescind, the underlying agreement:

> Where a party is defrauded, upon acquiring knowledge thereof he must elect whether to rescind the contract because of the fraud or affirm it and claim damages. If a defrauded party elects to disaffirm he must do so promptly and must ordinarily restore or offer to restore what he received under the contract. 12 Am.Jur., Contracts, section 146, page 638.

*Id.* The court then developed this point further by looking to § 480(1) of the Restatement (First) of Contracts:

> [S]ection 480(1) states, subject to certain exceptions not applicable here: "The power of any party * * * * to avoid a transaction for fraud or misrepresentation is conditional on an offer made promptly after acquiring knowledge of the fraud or misrepresentation to return the amount of any money or other performance received as part of the transaction, in substantially as good condition as when received by him, * * *."

> Id., section 484, states, also subject to exceptions no applicable here: "The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepre-

sentation manifests to the other party to the transaction an intention to affirm it or exercises dominion over the things restoration of which is a condition of his power of avoidance, * * *."

*Id.* The court stated in *Test* that it had frequently recognized this rule. *Id.* (citing cases).

In *Test,* the court found that the defrauded party had promptly discovered the alleged falsity of the other party's representations, but did not elect to disaffirm the agreement, instead keeping the benefits he had gained under the agreement, and no suit between the parties was commenced until more than a year later. *Id.* Thus, because "[t]here is no evidence [the defrauded party] attempted to disaffirm the contract or return what he received under it," the defrauded party could not rescind the agreement in judicial proceedings in equity at that late date on the ground of fraud. *Id.* at 526, 118 N.W.2d at 75–76.[12] In a later decision citing *Test,* the Iowa Supreme Court held that laches may bar rescission where the party seeking a rescission failed to meet the precondition of making a prompt offer to return the benefits of the bargain. *Clayburg v. Whitt,* 171 N.W.2d at 629.

■ In the present case, Utica has fulfilled this precondition for pursuing its rescission claim in court. Utica promptly discovered the alleged falsity of Stockdale's representations, and promptly elected to disaffirm the agreements. *Cf. Test,* 254 Iowa at 526, 118 N.W.2d at 76. Instead of keeping the benefits it had gained under the agreement, Utica promptly computed and attempted to return the premiums it had collected for the insurance policies at issue. *Id.* Promptly thereafter, Utica filed this lawsuit asking the court to declare a rescission of the contracts. *Id.* The court therefore turns to the merits of Utica's motion for partial summary judgment as to the most recent of the insurance contracts.

12. In a decision preceding *Test,* the Iowa Supreme Court also found that rescission by the party and return of whatever benefits the claimant had received from the offending party was also a necessary precondition to a suit for damages for claimed fraudulent misrepresentation. *Lungren v. Lamoni Provision Co.,* 248 Iowa 887, 82 N.W.2d 749, 754 (1957).

1200

### 3. Utica's right to summary judgment of rescission

■ Unfortunately, in light of the court's conclusions above concerning the nature of Utica's claim, the elements Utica must prove, and the standards applicable to proof of fraudulent misrepresentation entitling Utica to the remedy it seeks, rescission of the 1994–1995 policy, the court finds that the parties have either not properly characterized Utica's claim, the standards by which it should be disposed, or both.[13] To reiterate, in order to be entitled to rescission of the 1994–1995 policy on the ground that Stockdale's application for that policy contained misrepresentations, Utica must prove the following: (1) a representation, (2) falsity, (3) materiality, (4) intent to induce the plaintiff to act or refrain from acting, (5) reliance. *Cf. Wilden Clinic, Inc.*, 229 N.W.2d at 292 (stating "intent" element as "intent to deceive"). In equity, fraudulent misrepresentation may be proved by circumstantial evidence. *Wilden Clinic, Inc.*, 229 N.W.2d at 292; *First Nat'l Bank in Lenox*, 181 N.W.2d at 181; *Peterson*, 282 N.W.2d at 766 (citing *Wilden Clinic, Inc.*). If Utica proves these elements of fraudulent misrepresentation to the standards stated, it will be entitled to the equitable remedy of rescission of the 1994–1995 policy. *Robinson*, 412 N.W.2d at 567–68; *Wilden Clinic, Inc.*, 229 N.W.2d at 291–93. The court has already determined that there is no genuine issue of material fact that Utica has met the preconditions for a suit in equity to obtain rescission, because Utica attempted to rescind the policy and return the premiums paid upon it. Although Utica asserts that resolution of this matter turns entirely on the issue of whether its application question concerning "disciplinary action" was ambiguous, the court will nonetheless consider *seriatim* each of the five elements Utica must prove to obtain the requested relief.

■ **i. Representation.** There can be no genuine dispute that Stockdale's answer to the "disciplinary action" question was a representation, and indeed the parties do not dispute that fact. Stockdale's answer was an affirmative statement concerning its conduct or treatment by insurance authorities during the preceding year, and that representation did not disclose the Texas Cease and Desist Order. *Sinnard*, 414 N.W.2d at 105; *Cornell*, 408 N.W.2d at 374. Stockdale was under a legal duty to answer the application questions fully and honestly as the result of the parties' inequality of knowledge. *Id.*[14] The court therefore turns to the alleged falsity and materiality of Stockdale's representation.

■ **ii. Falsity.** Utica asserts that Stockdale's representation was false as a matter of law, because the Texas Cease and Desist Order was a "disciplinary action" that Stockdale failed to disclose. Utica asserts that there was no ambiguity about the meaning of "disciplinary action" in its application, a question of law for the court to be decided on the face of the document without recourse to the testimony of any witness, and that the Texas Cease and Desist Order fell within the unambiguous meaning of the term. Stockdale asserts that the meaning of "disciplinary

---

**13.** For example, both parties have devoted considerable attention to the questions of whether Stockdale knew of the falsity of its statement concerning disciplinary action or recklessly disregarded its falsity, and similarly whether Stockdale intended to deceive Utica. Neither scienter nor intent to deceive is an element of fraudulent misrepresentation in equity. Furthermore, Stockdale's extensive arguments about Utica's inability to show damages is irrelevant, because damages is not an element Utica must prove. Similarly, as will be explained further *infra*, Utica has consistently misstated the standard for determination of the materiality of Stockdale's alleged misrepresentations.

**14.** Utica cites *Webb v. American Family Mut. Ins. Co.*, 493 N.W.2d 808 (Iowa 1992), for the proposition that Stockdale was under a legal duty to make honest and complete responses to questions in an application for insurance. However, *Webb* is not particularly helpful on this point, as it does not involve alleged misrepresentations in applications for insurance, but alleged misrepresentations in a *claim* concerning the items lost in a fire. *Webb*, 493 N.W.2d at 810–11. The specific statement to which Utica points, in full, states "Insurance companies rely on insureds honestly filling out *inventory lists of destroyed property*. Dishonesty by insureds cannot be ignored." *Id.* at 812 (quoting *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wash.2d 643, 649, 757 P.2d 499, 502 (1988); emphasis added). The duty of honesty in applications for insurance is otherwise supportable, however.

action" is ambiguous. Stockdale's arguments for ambiguity are that Utica's representatives could come up with only vague definitions, Stockdale's own expert has opined that the Texas Cease and Desist Order was not a "disciplinary action," and that Stockdale's representatives did not believe at the time of the renewal application that the Texas Cease and Desist Order could be interpreted to be a "disciplinary action" within the meaning of the application.

Under Iowa law, an application for insurance becomes a part of the insurance contract by virtue of Iowa Code § 515.94 where the application is made a part of the contract "by the terms of such policy ... or contract of insurance, or [is] referred to therein, or which may in any manner affect the validity of such policy." The application for insurance in this case specifically states that "this application shall be the basis of the contract with the Utica Mutual Insurance Company, New Hartford, NY, and [is] deemed a part thereof." Thus, the question of whether any term in an application question is ambiguous must be determined by the standards for determination of the ambiguity of terms in an insurance contract. The court therefore turns to identification of those standards for determining ambiguity.

Those standards were recently summarized by the Iowa Supreme Court in *Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92 (Iowa 1995):

> The construction and interpretation of an insurance policy is a question of law for the court to decide. *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W.2d 203, 206 (Iowa 1995). The policy is to be construed as a whole, giving the words used their ordinary, not technical meaning to achieve a practical and fair interpretation. *Gracey v. Heritage Mut. Ins. Co.,* 518 N.W.2d 372, 373 (Iowa 1994). When the terms of an insurance policy are ambiguous, we will construe them against the insurer. *Id.* However, the mere fact that the parties disagree on the meaning of a particular term does not establish ambiguity. *Id.* We will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none. *West*

*Trucking Line, Inc. v. Northland Ins. Co.,* 459 N.W.2d 262, 263 (Iowa 1990).

*Morgan,* 534 N.W.2d at 99. The standards stated in *Morgan* are mirrored in myriad decisions by Iowa courts. *See, e.g., AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994) (terms given ordinary meaning as reasonable person would understand them, and disagreement between parties over meaning does not establish ambiguity); *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 108 (Iowa 1981) (disagreement between parties as to meaning does not establish ambiguity); *Pappas v. Bever,* 219 N.W.2d 720, 721 (Iowa 1974) (terms must be given their plain and ordinary meanings); *Tom Riley Law Firm, P.C. v. Tang,* 521 N.W.2d 758, 759 (Iowa Ct.App.1994) (disagreement of parties as to meaning does not establish ambiguity, citing *Sandbulte,* and terms must be given their ordinary meaning, citing *Pappas* ).

■■■ To the standards stated in *Morgan* must be added only a few further points on determinations of ambiguities in insurance contracts. Under Iowa contract law, " 'ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty exists as to which of two or more meanings is the proper one.' " *Jensen v. Jefferson County Mut. Ins. Ass'n,* 510 N.W.2d 870, 871 (Iowa 1994) (quoting *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.,* 227 N.W.2d 207, 210 (Iowa 1975)); *Motor Club of Iowa Ins. Co. v. Iowa Mut. Ins. Co.,* 508 N.W.2d 634, 636 (Iowa 1993); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 619 (Iowa 1991); *Iowa Fuel & Minerals v. Board of Regents,* 471 N.W.2d 859, 863 (Iowa 1991); *West Trucking Line, Inc. v. Northland Ins. Co.,* 459 N.W.2d 262, 263 (Iowa 1990); *Nepstad Custom Homes Co. v. Krull,* 527 N.W.2d 402, 405 (Iowa Ct.App.1994) (citing *Iowa Fuel & Minerals* ); *Tom Riley Law Firm, P.C.,* 521 N.W.2d at 759 (ambiguity exists when a genuine uncertainty exists over two or more meanings of the terms of the contract). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Met–Coil Sys. Corp. v. Columbia Cas. Co.,* 524 N.W.2d 650,

658 (Iowa 1994) (citing *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987)); *Cincinnati Ins. Co. v. Hopkins Sporting Goods*, 522 N.W.2d 837, 839 (Iowa 1994) (same standard); *Gracey*, 518 N.W.2d at 373 (posing same question); *Iowa Fuel*, 471 N.W.2d at 863 (citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)); *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987) (same standard); *Sandbulte*, 302 N.W.2d at 108 (posing same question); *see also Farm & City Ins. v. Anderson*, 509 N.W.2d 487, 491 (Iowa 1993) (formulating the test for ambiguity in an insurance policy as "whether a reasonable person would read more than one meaning into the words," citing *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.*, 484 N.W.2d 192, 194 (Iowa 1992)).

■ To add further emphasis to a point made in *Morgan*, it is a "fundamental rule" for interpreting insurance contracts that they must be construed in the light most favorable to the insured. *Cincinnati Ins.*, 522 N.W.2d at 839; *AMCO Ins. Co.*, 518 N.W.2d at 334 ("When the meaning of terms of an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted."); *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991); *North Star Mut. Ins. Co.*, 402 N.W.2d at 454; *Rich v. Dyna Technology, Inc.*, 204 N.W.2d 867, 872 (Iowa 1973) ("Where insurance contracts are ambiguous, require interpretation, or are susceptible to equally proper constructions, the court will adopt the construction most favorable to the insured.") *The Travelers v. Mays*, 434 N.W.2d 133, 134 (Iowa Ct.App. 1988) (quoting *Rich*). The reason for this rule is that insurance contracts are contracts of adhesion. *Cincinnati Ins.*, 522 N.W.2d at 839; *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619. However, this rule applies only when the terms of the policy are ambiguous or unclear. *Farm & City Ins.*, 509 N.W.2d at 490–91.

■ Although interpreting the meaning of an insurance policy words is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen*, 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). Extrinsic evidence refers to evidence other than the words of the policy. *Id.; Voeltz*, 431 N.W.2d at 785. When interpreting insurance policies, the court must " 'seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold.' " *Id.* (quoting *Voeltz*, 431 N.W.2d at 785).

■ Utica has asserted, both in briefs and at oral arguments, that the pertinent question is, "What else could this cease and desist order be?" That is not, however, the question for the court in considering whether or not the terms of the application are ambiguous, as the cases cited above demonstrate. *See, e.g., Met–Coil Sys.*, 524 N.W.2d at 658. The court may not resort to examination of the cease and desist order to determine ambiguity, but must instead look only at the application question. *Morgan*, 534 N.W.2d at 99. The question the court must resolve is, therefore, "Are the terms of the application susceptible to two or more meanings?" and in answering that question, the court may pay no regard to what the cease and desist order in question here might contain. *Met–Coil Sys.*, 524 N.W.2d at 658.

The critical question in the renewal application for insurance here asked Stockdale the following concerning its business since the previous year's application:

> 15. Have there been any fines or disciplinary action, including license suspension, taken against you, your employees, or your associates by any insurance regulatory agency?

Examining the language as a whole, and giving the words their ordinary meanings, *Morgan*, 534 N.W.2d at 99, the court concludes that the question is ambiguous.

First, although the question suggests two kinds of actions that are specifically to be reported, fines and "disciplinary actions," the latter term is explained only by indicating that it includes "license suspension." However, the term "disciplinary actions" is reasonably susceptible to at least two meanings:

"punitive" actions and "regulatory" actions. This first meaning comes from the ordinary meaning of "disciplinary," which is "designed to correct or punish breaches of discipline (took—action)." *Webster's Ninth New Collegiate Dictionary*, 360. Similarly, "discipline" is defined as "punishment." *Id.* The second meaning comes naturally from the identified actor, a "regulatory" agency. Again, applying ordinary meanings, "regulatory" refers to regulation or regulating, and to "regulate" means "to govern or direct according to rule," or "to bring under the control of law or constituted authority." *Id.* at 992. Common sense and experience suggest that not all regulatory actions are punitive, and therefore are not necessarily "disciplinary" within the first meaning suggested here.

Utica cites as the sole authority unearthed by either party for the proposition that cease and desist orders are disciplinary actions, the decision of the California Court of Appeals in *Greenberg v. Equitable Life Assurance Society of U.S.*, 34 Cal.App.3d 994, 110 Cal.Rptr. 470, 475 (1973), which states that "the sole disciplinary authority of the commissioner would be to issue a cease and desist order or obtain an injunction to restrain the illegal conduct." This is simply insufficient authority for this court to hold as a matter of law that all cease and desist orders are disciplinary actions, and it does not answer the question of whether or not "disciplinary action" is ambiguous.

This ambiguity in the application question as to the meaning of "disciplinary action" must be construed against Utica. *Cincinnati Ins.*, 522 N.W.2d at 839. Consequently, Stockdale's interpretation that "disciplinary action" did not include cease and desist orders with no "punitive" aspect must be accepted. *Id.* However, even if the court found that the term "disciplinary action" was not ambiguous, the court would still have to entertain the question of whether or not the Texas Cease and Desist Order was indeed a "disciplinary action" within the unambiguous meaning of the application question in order to determine the truth or falsity of Stockdale's response.

The determination of whether a document separate from the insurance contract falls within the meaning of terms in the contract becomes a question of fact, because it depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen*, 510 N.W.2d at 871; *Voeltz*, 431 N.W.2d at 785. The extrinsic evidence here is the Cease and Desist Order itself. *Id.* (extrinsic evidence is evidence other than the words of the policy); *Voeltz*, 431 N.W.2d at 785 (same). There is a genuine issue of material fact raised by the Texas Cease and Desist Order as to the nature of the proceedings which led to its promulgation, the evidence upon which it was based, the degree of investigation leading the Texas Department of Insurance to seek the Cease and Desist Order, the target of their investigation, the effect of Stockdale's compliance with the Order, and whether, in the circumstances, the Cease and Desist Order was a "disciplinary action." To be more specific as to but one of these points, the Texas Cease and Desist Order specifies certain penalties for noncompliance with its terms.[15] A reasonable inference to be drawn from this fact is that noncompliance with the Texas Cease and Desist Order would constitute grounds for "disciplinary," *i.e.*, "punitive" action, but that the Cease and Desist Order was itself only "regulatory."

Thus, there is a genuine issue of material fact as to the falsity element of fraudulent misrepresentation precluding summary judgment for Utica on its action to rescind the 1994–1995 renewal policy. *Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Even if the court could conclude that there was no genuine issue of material fact as to falsity, the court would still be constrained to consider the remaining elements Utica has the burden to prove.

***iii. Materiality.*** Utica asserts that answers to questions in an application for insurance are material to the contract of insurance as a matter of law, citing *Crandall v. Bankers Life Co.*, 245 Iowa 540, 62 N.W.2d 169, 174 (1954). In *Crandall*, the Iowa Su-

---

**15.** See *supra* at p. 1186–87.

preme Court upheld the district court's determination that answers to questions in an insurance application were material as a matter of law, quoting a decision of the Fourth Circuit Court of Appeals:

In *Fountain & Herrington v. Mutual Life Ins. Co.*, 4 Cir., 55 F.2d 120, 123 [ (1932) ], it is stated:

" * * * Answers made in response to questions in an application as to prior illness, consultation with physicians and applications for other insurance, where the applicant, as here, declares that they are true and offers them as an inducement to the issuance of the policy, are deemed material as a matter of law. * * * "

*Crandall*, 62 N.W.2d at 174. However, *Crandall* is distinguishable from the present circumstances, which do not involve health insurance or life insurance, and in which illness, consultation with physicians and applications for other insurance are not present. In *Crandall*, it was plain that the questions purportedly answered falsely went to the root of the insurability of the applicant for the risk in question. *Crandall* does not answer the question of the materiality of questions concerning disciplinary action to the insurability of an applicant for errors and omissions insurance.

Utica has consistently asserted that the question of materiality is whether it would have "done something different" in considering Stockdale's renewal application had it not contained a misrepresentation. Utica points to testimony of its underwriter that if she had been aware of the Texas Cease and Desist Order, she would at least have investigated the matter further, although she could not say that she would not have renewed the policy even knowing everything she now knows. Utica's assertion of the "done something different" standard seems to stem from Utica's assertion that the standard for materiality is whether the statement "would rea-

sonably affect" the insurer's judgment, citing *Pedersen v. Life of Mid–America Ins. Co.*, 164 N.W.2d 337, 345 (Iowa 1969). However, *Pedersen* is patently inapposite to the present controversy. That case considers the standards for an *agent's* duty of disclosure to its *principal*, and not a situation in which any applicant for insurance provides information to an insurer. *Pedersen*, 164 N.W.2d at 345.[16]

The proper standard of materiality, however, is that a fact is material if it substantially affects the interest of the party alleged to have been defrauded. *Wilden Clinic, Inc.*, 229 N.W.2d at 292. Thus, materiality has been found where a fact influences a person to enter into a transaction, where it deceives that person or induces that person to act, or where the transaction would not have occurred without it. *Id.* at 286; *First National Bank of Lenox*, 181 N.W.2d at 182; *Rosenberg*, 252 Iowa at 486, 106 N.W.2d at 80; *Peterson*, 282 N.W.2d at 765 (citing *Wilden Clinic, Inc.*); *see also O'Rieley*, 297 F.2d at 5 (8th Cir.1961) (applying Iowa law, the court, observed that representations are material if " 'but for them the contract or deal would not have been made,' " quoting *Rorem v. Pederson*, 199 Iowa 304, 201 N.W. 784, 786 (1925)). These standards require that, to be material, the representation at a minimum influence a party to *enter* into the contract, not merely "do something different" before entering into the contract. The weight of authority suggests that the representation must be such that the transaction would not have occurred without it.

Stockdale has generated a genuine issue of material fact as to the materiality of the alleged misrepresentation here by presenting evidence that Utica's own representatives would have, at most, conducted some further investigation, but might still, despite the fullness of the information now available to them, have renewed Stockdale's errors and omissions policy. Furthermore, Stockdale

---

16. *Ennen v. Public Serv. Mut. Ins. Co.*, 774 F.2d 321 (8th Cir.1985), which Utica also cites for this proposition, simply does not support it. In *Ennen*, the defendant asserted that a proper instruction on materiality would have been that the misrepresentation materially increased the risk of loss or influenced the insurer's decision to

accept the risk. *Ennen*, 774 F.2d at 324. However, the court did not address, or even quote, the portion of the instruction on fraudulent misrepresentation that addressed materiality. *Id.* Instead, the court simply held that the instructions as a whole were proper, expressly considering only the instruction on intent to deceive. *Id.*

has presented evidence that Utica has not routinely denied renewals on the basis of disciplinary action, although it is uncertain from the summary judgment whether Utica has ever had cause to consider such a ground for denial. Thus, the court cannot say as a matter of law that Utica would not have renewed the policy if the alleged misrepresentation had not been made.

 **iv. Intent to induce Utica to contract.** Although the court finds that there is a genuine issue of material fact as to the materiality of the alleged misrepresentations, the court finds as a matter of law that the answers Stockdale gave in its application for insurance can have been given for no other reason than to induce Utica to renew its errors and omissions policy for the 1994–1995 policy year.[17]

 **v. Reliance.** The court turns finally to the question of whether it can conclude as a matter of law that Utica relied on the representations embodied in Stockdale's answer to the "disciplinary action" question. While Utica has failed to present evidence that it relied in any way on the specific representation in question here, Stockdale has generated a genuine issue of material fact as to the extent to which Utica relied on information provided in the application for renewal of the 1994–1995 policy. Specifically, Stockdale has presented evidence that Utica failed to carry forward investigations concerning prior answers Stockdale gave in applications that were initially identified by an underwriter as raising questions about the identity and financial stability of Global, the company with whom Stockdale indicated it was doing a significant share of its business. Similarly, Utica did not respond to the significant realignment of Stockdale's business as reflected in its renewal application when compared to prior business years. Finally, Stockdale has presented evidence of the rou-

tine manner in which Utica renewed applications, and Utica's emphasis on the prior year's claims as the ground for denial of a renewal. There is therefore a genuine issue of material fact as to whether Utica relied on the alleged misrepresentation in making its ultimate determination of whether or not to enter into the contract. *Air Host Cedar Rapids*, 464 N.W.2d at 454.

The court therefore concludes that there are genuine issues of material fact as to three of the five elements of fraudulent misrepresentation Utica must prove in order to be entitled to the equitable relief it seeks. Those elements are falsity, materiality, and reliance. The court therefore concludes that a reasonable trier of fact could find in favor of Stockdale on Utica's claim for rescission, and Utica's motion for partial summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

## V. CONCLUSION

Because of the disparate views of the parties concerning what was at issue in this motion for partial summary judgment, it has been necessary for the court to determine the precise nature and elements of the cause of action brought by Utica. The court determined that Utica's action was for equitable relief of rescission of its insurance policy, and that its asserted ground for that relief was alleged fraudulent misrepresentation in Stockdale's renewal application. Such a cause of action is distinguishable from an action at law to recover damages resulting from fraudulent misrepresentation.

The court then determined that, because Utica asserted equitable grounds for rescission, the elements of fraudulent misrepresentation that it was required to prove differed from those required to prove fraudulent misrepresentation at law. Although proof of

---

17. The court views the intent element as going to the purpose for which representations are made, whereas materiality goes to the weight to be given any particular representation. Thus, all of the answers Stockdale gave on the application were given for the purpose of obtaining the renewal of its errors and omissions insurance. Unlike the questions allegedly answered falsely in *Crandall*, the court cannot view the "disciplinary

action" question as going to the heart of the risk Stockdale posed to an errors and omissions insurer, a materiality assessment, even though it is now the focus of the dispute between the parties. However, like its answers to all of the other questions on the application form, Stockdale answered the "disciplinary action" question expressly for the purpose of obtaining renewal of its errors and omissions policy.

fraudulent misrepresentation at law is recognized in Iowa as sufficient for the court to order the equitable relief of rescission, it is not necessary to prove the elements of fraud at law to obtain that relief. Rather, the scienter and damages elements the plaintiff must prove in a fraudulent misrepresentation action at law are not necessary elements of proof of fraud in equity.

As to the intent element of fraudulent misrepresentation in equity, the court determined that Utica must prove intent to induce entry into the contract, as opposed to intent to deceive, which inappropriately reintroduces the scienter element into an equity action. The court therefore determined that Utica must prove the following five elements: (1) a representation, (2) falsity, (3) materiality, (4) intent to induce the plaintiff to act or refrain from acting, (5) reliance.

Turning to these elements, the court finds that Stockdale has generated a genuine issue of material fact as to falsity, materiality, and reliance. The court found as a matter of law that the term "disciplinary action" in the application was susceptible to at least two meanings, either including both "punitive" and "regulatory" actions, or only the first. Consequently, there was a genuine issue of material fact that could only be resolved by extrinsic evidence as to whether the cease and desist order in question here was a "disciplinary action" within the meaning of the application question, and therefore whether Stockdale answered the question falsely. Stockdale also generated a genuine issue of material fact as to materiality, because it presented evidence that Utica would not have refused to enter the contract had it received all of the information now available to it, and that Utica does not routinely make renewal decisions on the basis of answers to questions concerning disciplinary actions. As to reliance, Utica presented no evidence that it relied on the alleged misrepresentation in making its ultimate determination of whether or not to enter into the contract. Stockdale, on the other hand, presented evidence that Utica did not rely on Stockdale's answer to the question concerning disciplinary action in making its ultimate decision to renew the contract in this case.

Because there remain genuine issues of material fact unresolved by the summary judgment record, Utica's motion for partial summary judgment as to the 1994–1995 insurance policy must be denied.

**IT IS SO ORDERED.**