Stephen A. RUBES, Appellee,

v.

**MEGA LIFE AND HEALTH INSURANCE COMPANY, INC., Appellant.**

No. 01–0433.

Supreme Court of Iowa.

Feb. 27, 2002.

Rehearing Denied April 22, 2002.

Jaki K. Samuelson and Jason M. Casini of Whitfield & Eddy, P.L.C., Des Moines, for appellant.

Joseph J. Hrvol of Joseph J. Hrvol, P.C., Council Bluffs, and Joseph B. Reedy, Council Bluffs, for appellee.

NEUMAN, Justice.

This declaratory judgment action concerns plaintiff Stephen Rubes' coverage for health and medical expenses under a policy of insurance issued by defendant MEGA Life and Health Insurance Company, Inc. (MEGA). Resolution of the controversy hinges on the application of competing equitable theories to a disputed factual record: Whether Rubes materially misrepresented his health history so as to justify rescission by MEGA and, if so, whether MEGA should be equitably estopped from rescinding because its decision was not conveyed until Rubes' cost-

ly—but lifesaving—liver transplant operation was complete.

■ The parties agree the case sounds in equity and thus our review is de novo. *See Ralfs v. Mowry,* 586 N.W.2d 369, 371 (Iowa 1998) (standard of review rests on predominantly equitable nature of theories at issue). Under that review standard, we are not bound by the district court's factual findings but we may give them weight, especially with regard to the credibility of witnesses. *Perkins v. Madison County Livestock & Fair Ass'n,* 613 N.W.2d 264, 266 (Iowa 2000).

■ As in many cases, credibility determinations are crucial here. Yet our ability to apply the usual deferential standard is undermined by the court's verbatim adoption of Rubes' proposed factual findings and legal conclusions on this point. We have in the past cautioned trial courts about the perils of such practice. *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 435 (Iowa 1984). We do so again because the customary deference accorded trial courts cannot fairly be applied when the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles. *See id.; see also Phoenix Eng'g & Supply Inc. v. Universal Elec. Co.,* 104 F.3d 1137, 1140 (9th Cir.1997) (close scrutiny of record required where trial court adopts one party's proposed findings); *In re Las Colinas, Inc.,* 426 F.2d 1005, 1009, 1010 (1st Cir.1970) (practice of adopting proposed findings should be limited to "extraordinary cases" of a "highly technical nature requiring expertise" not possessed by trial court; to extent decision does not reflect independent work, "the more careful we are obliged to be in our review").

We are convinced from our independent review of the trial testimony and exhibits that MEGA lawfully rescinded Rubes' con-

tract of insurance. We further conclude that the company's decision to do so, although regrettably late, was not without fair warning to Rubes well in advance of surgery. We therefore reverse the contrary judgment of the district court and remand for entry of a judgment rescinding the contract.

## I. Background Facts and Proceedings.

This case centers on information conveyed by Rubes to his health insurer, MEGA, on an application for insurance dated July 15, 1998. For over a year before submitting this application, Rubes had been uninsured. Before that time, Rubes—who practices law as a sole practitioner—had been covered under a policy furnished by his wife's employer. Rubes' marriage was dissolved in April 1997. He put off securing his own policy until the illness and hospitalization that started this controversy.

On May 31, 1998, Rubes visited a physician in Council Bluffs complaining of fever, chills and shortness of breath. The physician suspected pneumonia. Rubes was then admitted to St. Joseph's hospital in Omaha for intravenous antibiotics and further tests. The hospital's admitting notes indicate that Rubes reported "a history of alcohol abuse" including outpatient treatment for alcoholism but no other serious health history. Lab work performed at the hospital revealed extremely low white blood cell and platelet counts. These results prompted screening for HIV and hepatitis. Liver function tests were ordered based on Rubes' enlarged liver and spleen. These tests revealed elevated liver enzymes.

The administration of antibiotics resolved Rubes' acute symptoms shortly after admission to the hospital. He was

eager to be discharged because he had no insurance to cover the expense and, moreover, his hospitalization conflicted with plans to attend his sister's wedding in California. Rubes' sister happens to be a physician, so Rubes prevailed upon his doctor to release him to her care. The physician's discharge notes reveal that he spoke to Rubes' sister, Dr. Susan Rubes–Heller, who assured him that she would draw "a CBC and set of liver function tests there as well."

Upon his arrival in California, Rubes was examined by his sister. She did not observe the liver or spleen enlargement noted in the St. Joseph's hospital records, nor did she observe any other symptoms of liver disease. Blood tests she performed revealed a low white cell count but the liver function results showed improvement when compared to the tests administered at St. Joseph's. She also learned, either from Rubes or from hospital personnel, that his HIV test was negative, as was the hepatitis screen. This was good news and minimized her concerns about liver disease. She evidently advised Rubes accordingly. What Dr. Rubes–Heller did not learn until mid-August was that not all the hepatitis results were reported before Rubes' discharge from the hospital. The full results disclosed the presence of the hepatitis B antibody (indicating a previous infection) and active hepatitis C.

Meanwhile, upon his return to Iowa, Rubes began shopping around for insurance. He called William Steiner, an agent for MEGA. Steiner testified that when responding to such calls he routinely inquires about medical history and treatment for drug and alcohol abuse because such matters may automatically disqualify the applicant, making further contacts futile. Evidently Steiner's preliminary inquiry revealed no such concerns because he arranged to meet with Rubes to fill out an application. What transpired at their meeting, and the answers contained on Rubes' application form, are at the heart of this controversy.

At this point additional facts about Rubes' personal history become important. Rubes candidly testified at trial that he is a recovering alcoholic. In 1991 he was convicted for drunk driving and completed a thirty-day outpatient treatment program for alcoholism. That treatment followed a long history of substance abuse, including IV drug use (heroin) during the 1970s and marijuana and cocaine use (as well as alcohol abuse) throughout the 1980s. He had an additional arrest for driving under the influence in the 1970s. He has reportedly maintained his sobriety since 1991 and actively participates in Alcoholics Anonymous (AA).

The MEGA application completed by Rubes on July 15, 1998 revealed none of this drug or alcohol history. In response to the question "Have you ... EVER had symptoms or been treated for ... alcoholism or drug addiction," Rubes answered "no." He likewise answered "no" to the question "Have you ... ever had your driver's license suspended ... or received any citations for driving while under the influence (i.e. DWI or DUI)?" Despite his recent hospitalization for pneumonia, Rubes answered "no" to a question regarding symptoms of "[r]espiratory disorder ... or breathing problems." Rubes, however, gave a positive response to an inquiry concerning "medical ... advice, hospitalizations, treatment or operations in the last 5 years." He described his May–June hospitalization this way: "bacterial infection, 100% full recovery, [n]o follow up medication or treatment." He also listed the names, addresses and phone numbers of the hospital and physician.

Rubes admitted at trial that the application contained false responses concerning

his arrest record for drunk driving, substance abuse treatment and hospitalizations. He ascribed any misrepresentation, however, to MEGA's agent, Steiner. It is undisputed that Steiner asked the questions and filled out the form. Rubes maintains that he answered all inquiries about his alcoholism and drunk driving arrests truthfully, consistent with his customary AA routine. He insists that Steiner told him matters predating the application by five years were irrelevant and need not be reported. He acknowledged that he personally signed the application, attesting to its truthfulness, but asserts he did not read it before doing so.

Steiner, an insurance agent for over thirty years, adamantly denied editing either the questions or Rubes' answers. But he admitted on cross-examination that he had no personal recollection of meeting Rubes or completing his application; he based his testimony on decades of customary practice, reading the questions as written and recording the applicants' answers precisely as given.

Rubes' application was approved and MEGA issued a policy of insurance effective August 1, 1998. In November 1998 Rubes was hospitalized for severe gastrointestinal bleeding. In his words, he "about bled to death" at home. He was diagnosed with "cirrhosis probably secondary to hepatitis C infection" and referred to the University of Nebraska Medical Center for consultation about a liver transplant. University staff advised that his policy with MEGA contained a one-year exclusion for pre-existing medical conditions so that a transplant would not be covered until August 1, 1999, at the earliest. Given the waiting list for organ transplants, the delay in payment was the least of Rubes' concerns.

Rubes' November 1998 hospitalization claims triggered MEGA's review of Rubes'

insurance application. It was during this investigation that MEGA examined the medical records relating to his May 1998 hospitalization. That record, of course, revealed Rubes' history of alcoholism as well as the extent to which liver disease was suspected at that time.

MEGA paid none of Rubes' pending hospital bills. In a letter dated August 12, 1999, MEGA advised Rubes that material misrepresentations regarding his health history were found in his application. Had Rubes revealed the full extent of his medical history, the company advised, it would have declined coverage. Before taking action to rescind the policy, however, MEGA gave Rubes fifteen days to furnish additional information concerning his previous illness and medical treatment. Rubes did not respond to the letter. On August 13, 1999, he filed this declaratory judgment action concerning his coverage under the policy. MEGA counterclaimed for rescission of the insurance contract.

While the declaratory judgment action was pending, Rubes' plans for a liver transplant proceeded. He was assigned to a patient transplant financial coordinator, Michael Chaney, who communicated with MEGA concerning Rubes' insurance coverage. Chaney testified that he received both written and oral confirmation that Rubes' transplant was deemed by the company to be "medically necessary and approved." He admitted, however, that MEGA's correspondence also carried customary language disclaiming any "guarantee" to benefit payment "prior to services actually being rendered." From August 3, 1998 to May 8, 1999, Chaney periodically confirmed Rubes' active status as a policyholder. At no time did Rubes or MEGA advise Chaney that the parties were engaged in litigation over his coverage.

On May 10, 1999, MEGA took action to rescind Rubes' policy by issuing him a

refund check for all premiums paid less claims paid for prescription drugs. The notice did not reach Rubes until after his successful transplant operation on May 15, 1999.

Trial over the coverage question took place in January 2001. The district court entered judgment in Rubes' favor, concluding that his application for insurance disclosed the full extent of his knowledge concerning the May 1998 hospitalization, that Rubes answered truthfully all questions posed to him by Steiner, and that any errors in making the application were the agent's, not Rubes'. This appeal by MEGA followed.

## II. Issues on Appeal.

MEGA argues that the district court's judgment for Rubes cannot withstand scrutiny, factually or legally. It contends the court ignored crucial admissions and objectively false disclosures entitling it to rescission under the standard announced in *Hyler v. Garner*, 548 N.W.2d 864 (Iowa 1996). Rubes counters that MEGA was required to prove intent to deceive, or scienter, in order to prevail on a rescission claim based on misrepresentation. He insists that any misstatements on the application were attributable to MEGA's agent, Steiner.

The parties likewise disagree on the court's alternative ruling on equitable estoppel. MEGA insists the doctrine has no application where, as here, its intention to rescind was made clear and thus dispels Rubes' claim he acted in reliance on the insurer's promise of benefits. We shall consider the arguments in turn.

■ *A.* *Equitable Rescission.* In general, "fraudulent misrepresentations leading to the creation of a contract give rise to a right of rescission." *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 568 (Iowa 1987); *accord Hyler*, 548

N.W.2d at 870. When a party relies on the doctrine of equitable rescission to avoid a contract, five elements must be proven: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance." *Hyler*, 548 N.W.2d at 872; *accord Utica Mut. Ins. Co. v. Stockdale Agency*, 892 F.Supp. 1179, 1193 (N.D.Iowa 1995).

■ At issue here is a dispute over the requisite "intent" needed to fulfill the equitable rescission doctrine's fourth element. Consistent with the rule recited above, MEGA argues that the intent required is only that Rubes intended to *induce* MEGA into acting favorably on his application. Rubes contends, and the district court ruled, that an intent to *deceive* the defendant must be shown. MEGA's position is plainly the correct one.

■ This court's recent discussion in *Hyler*, and the federal court's exhaustive treatment of the topic in *Utica*, clarified the historical distinction drawn between the proof required to sustain an equitable action to rescind a contract and the proof required to recover at law based on fraudulent representation. An action to rescind a contract is regarded as less severe, and hence less demanding in its proof requirements, than an action at law for damages based on fraud. *Hyler*, 548 N.W.2d at 871. In an equitable rescission action, it is not the knowledge of falsity that is at issue, but "whether misrepresentations induced the complaining party to contract." *Utica*, 892 F.Supp. at 1195. As this court stated in *Hyler*, injecting an "intent to deceive" element in a rescission case would reintroduce the concept of scienter, "making the elimination of this requirement in equity cases illusory." *Hyler*, 548 N.W.2d at 872.

■ Applying the correct formulation of the law to the record ·before us, we are convinced MEGA proved all five elements entitling it to rescind Rubes' contract of insurance. Rubes made several **representations** to MEGA's agent concerning his health history, drunk driving arrests and alcoholism. In this context, a representation includes not only an affirmative statement but the omission or nondisclosure of a pertinent fact. *Utica*, 892 F.Supp. at 1194.

■ The alleged **falsity** of Rubes' representations was hotly contested at trial. Given Rubes' long history of alcohol and drug abuse, including two arrests for drunk driving, it is inconceivable to us that he could be found to have truthfully answered "no" to a question asking whether he had "EVER had symptoms or been treated for ... alcoholism or drug addiction." A reasonable fact finder might find that Rubes was ignorant of, or in denial over, the extent of his liver disease. After all, his sister minimized, the symptoms and she testified that she did not carefully examine the hepatitis test results until two weeks after the policy was issued. But having just been diagnosed and treated for pneumonia two weeks before applying for coverage, it strains credulity that Rubes would answer "no" to an inquiry concerning "EVER" having symptoms of a respiratory disorder. Rubes' bald allegation that the agent filled out the form and edited his answers cannot save him. Having been given an opportunity to review the document before signing it, but failing to do so, Rubes is now in no position to question the answers he certified. *See Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486–87 (Iowa 1999); *Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct.App.1998); *Advance Elevator Co. v. Four State Supply Co.*, 572 N.W.2d 186, 188 (Iowa Ct.App.1997).

The district court's decision, relying heavily on findings prepared by Rubes' counsel, drew the credibility line in Rubes' favor. We believe compelling proof in the record points in the opposite direction. Applications submitted contemporaneously by Rubes to other potential insurers revealed similar departures from the truth, even including a denial that other applications were pending. And a psychologist's evaluation submitted in connection with Rubes' transplant surgery described Rubes as "somewhat manipulative and untruthful at times," a telling observation.

■ There is no dispute that each of Rubes' representations was **material** to MEGA's determination regarding his eligibility for coverage. Factors bearing on materiality include whether a representation "influences a person to enter into a transaction, ... induces that person to act, or where the transaction would not have occurred without it." *Utica*, 892 F.Supp. at 1194. MEGA's underwriter, Doug Kornegay, testified that had the company been made aware of Rubes *ever* having received treatment for alcoholism, the answer would have raised a "red flag" prompting MEGA to examine Rubes' driving records and health history further. For a conviction for driving while intoxicated or treatment of alcoholism within the prior ten years, coverage would have been declined. Similarly, had the application listed "elevated liver enzymes" or "enlarged liver"— as reported on Rubes' hospital discharge— instead of "bacterial infection" as Rubes reported, further inquiry would have been triggered and coverage declined.

■ The fourth element—**intent to induce the other to act**—goes to the purpose for which the representations are made. *Id.* at 1205 n. 17. Clearly the application for insurance, including the answers it contained, was submitted by Rubes for the sole purpose of securing

health insurance from MEGA. As already noted, proof of this element does not require proof of intent to deceive. *See Hyler*, 548 N.W.2d at 871–72. The questions asked by MEGA called for objectively factual answers, a matter bringing us to the fifth and final element, **justifiable reliance**. Unlike the factual scenarios underlying the older insurance cases upon which Rubes relies, MEGA's application did not ask Rubes to speculate about the general state of his health. *Cf. Dezsi v. Mut. Ben. Health & Accident Ass'n*, 255 Iowa 1027, 1034–35, 125 N.W.2d 219, 223 (1963) (insured's affirmative answer regarding good health and freedom from disease not a warranty but a representation that may, in good faith, be truthful); *Serv. Life Ins. Co. v. McCullough*, 234 Iowa 817, 828, 13 N.W.2d 440, 444–45 (1944) (same). Instead MEGA's application sought straightforward answers to known past information. MEGA was justified in relying on the answers given by Rubes and plainly relied on them to its detriment in extending health insurance coverage to him.

In summary, we are convinced that application of the correct legal standard to the record before us justifies equitable rescission of the insurance contract based on Rubes' material misrepresentation of his health and criminal history. We therefore turn to the remaining question: Is MEGA equitably estopped from avoiding the contract on a theory of rescission because of its delay or waiver?

**B. Equitable Estoppel.** The district court, reciting verbatim from Rubes' proposed findings, ruled on his claim of estoppel this way:

> Defendant is estopped from denying coverage because it has retained premiums until after Plaintiff had already been placed on a transplant list and continued to take the premiums until after the Plaintiff had finally obtained a transplant. It also processed other claims of Plaintiff despite the knowledge of the allegedly false statements made by him ... and, most importantly, informed the organ transplant unit at the University of Nebraska Medical Center on continuing occasions and through the transplant procedure itself, that Plaintiff's procedure was covered under the policy.

MEGA argues on appeal that these conclusions have neither factual nor legal support in this record. We agree.

A party relying on equitable estoppel must prove four things: (1) the opposing party misrepresented or concealed material facts, (2) the party relying on estoppel lacked knowledge of the true facts, (3) the party misrepresenting or concealing the true facts intended the deceived party to act on those representations, and (4) detrimental reliance by the party to whom the representations were made. *Folkers v. Britt*, 457 N.W.2d 578, 582 (Iowa 1990). Absence of any one of the elements prevents the doctrine's application. *Id.* The essence of the doctrine is that "one who has made certain representations should not thereafter be permitted to change his position to the prejudice of one who has relied thereon." *Ahrendsen ex rel. Ahrendsen v. Iowa Dep't of Human Servs.*, 613 N.W.2d 674, 678 (Iowa 2000) (citation omitted).

Here the court's estoppel ruling rested heavily on representations allegedly made by MEGA to the transplant unit. This is a legally unsound application of the doctrine, given the fact that it is Rubes who is asserting estoppel based on MEGA's representations, not the transplant unit. *See Wendt v. White Pigeon Mut. Ins. Ass'n*, 418 N.W.2d 374, 376 (Iowa Ct.App.1987) (representation made by *insurer* to *insured* sufficient to equitably estop insurer from asserting statute of

limitation defense). If it were the transplant unit seeking payment under the policy MEGA seeks to rescind, MEGA's representations to it might be relevant. But that is not the case before us.

The fact is that MEGA never altered its course with regard to Rubes. It refused to pay the claim for Rubes' November 1998 hospitalization and advised that his policy would be rescinded if the misrepresentations it suspected were founded. This was not a false representation on MEGA's part. The company fully intended for Rubes to rely on this representation and respond accordingly. At no time was Rubes without the true facts. In short, Rubes' claim of equitable estoppel based on misrepresentation rests on inadequate proof to defeat MEGA's right to rescission.

That brings us to Rubes' claim of estoppel by acquiescence, or waiver. The theory applies where a party, knowing of an enforceable right, neglects enforcement for such a length of time that the law implies its waiver or abandonment. *Westfield Ins. Cos. v. Econ. Fire & Cas. Co.*, 623 N.W.2d 871, 880 (Iowa 2001). Rubes essentially claimed, and the court agreed, that MEGA's retention of his premiums "until after the Plaintiff had finally obtained a transplant" estopped it from rescinding its obligations under the contract.

We agree with MEGA that the record does not factually support the court's finding that MEGA retained Rubes' premiums until after his transplant was completed. MEGA, as uncertain as Rubes about when the needed organ might become available, issued a refund check to Rubes five days in advance of the transplant surgery. It is true, however, that the check did not reach Rubes before the surgery was performed.

The only case relied upon by the court to legally support its waiver theory, *Venz v. State Automobile Insurance Association*, 217 Iowa 662, 251 N.W. 27 (1933), is factually distinguishable from this case. In *Venz*, an insurer knowingly retained an additional premium for an underage driver and then, when the driver was involved in an accident, refused to honor coverage *or* return the insured's premiums. *Venz*, 217 Iowa at 668, 251 N.W. at 29. This court held under such facts the company waived the underage condition of the driver and could not, having retained the premiums, repudiate its liability under the contract. *Id.* at 669, 251 N.W. at 30.

Here the parties were engaged in unresolved litigation over what the insurer knew about Rubes' history based on his application. That litigation extended for nearly nine months in advance of surgery, and MEGA had refused payment of benefits for more than a year before that. It was in Rubes' interest to keep making monthly premium payments so as not to give the company an independent ground to cancel the policy. Company officials testified that judgments about rescission are never made hastily, given their potential impact on the insured and company alike. And so although it appears in retrospect that MEGA could have made its decision more swiftly, we do not believe the equities of the situation warrant the extraordinary remedy of requiring coverage in the face of Rubes' demonstrated fraud.

We therefore reverse the judgment of the district court and remand for entry of a judgment rescinding MEGA's contract of insurance on Stephen Rubes.

**REVERSED AND REMANDED.**