**IN THE COURT OF APPEALS OF IOWA**

No. 22-0096
Filed November 2, 2022

**KELLI ANN WILLMAN,**
        Plaintiff-Appellee,

**vs.**

**JAMES ELLERBACH,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter,

Judge.


        James Ellerbach appeals a district court ruling that required him to pay Kelli

Willman the proceeds of a life insurance policy after Ellerbach's retention of the

value of outstanding loans.  **AFFIRMED.**


        Todd J. Locher of Locher & Davis PLC, Farley, for appellant.

        D. Flint Drake and Samuel M. Degree of Drake Law Firm, P.C., Dubuque,

for appellee.


        Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**SCHUMACHER, Judge.**

James (Jim) Ellerbach appeals a district court decision, in which the court ordered him to pay Kelli Willman approximately $326,000 from a life insurance policy he received following Kelli's husband's death. He contends promissory notes that accompanied loans he provided Kelli's husband, Gary Willman, as well as oral agreements, entitle him to the full value of the life insurance policy. He further contends that even if he is not entitled to the full value of the life insurance policy, the district court incorrectly calculated the outstanding debt secured by the policy. We conclude the district court properly found Jim was only entitled to approximately $173,000 of the life insurance proceeds, while Kelli was entitled to the remaining $326,000. Accordingly, we affirm.

## I.      Background Facts & Proceedings

Jim and Gary first became acquainted in 2013 through Gary's work as a realtor. Over the next several years, Jim purchased numerous properties with Gary's assistance. Gary managed several of those properties, which Jim rented out for income.

Gary approached Jim in 2015, requesting loans for Gary's business. Jim initially agreed and provided two loans to Gary. However, due to the sums involved, Jim requested collateral. According to Jim, Gary informed him, "I took out a million dollars [life insurance] policy and it would just be in [Jim's] name and [he could] do whatever [he] want[ed] with it." Jim claims he was first informed of Gary's life insurance policy on July, 24, 2016. However, the life insurance company sent Jim a copy of a conditional assignment Gary completed, dated April 6, 2016. In relevant part, it provided, "The Assignee [(Jim)] shall pay any

balance of sums received hereunder from the Company remaining after payment of the then existing liabilities, matured or unmatured, to the person entitled thereto under the terms of the policy had this assignment not been executed." The life insurance policy, executed on March 26, 2014, listed Gary's wife, Kelli, as the primary beneficiary. And contrary to Gary's purported representations to Jim, the policy value was $500,000.

Over the course of the next four years, Gary and Jim executed dozens of transactions. Some loans had due dates roughly one year after their execution, while others were short-term—due only one or two weeks after the loans were made. Many, but not all, of the loans were made with accompanying promissory notes. The promissory notes all contained the same language. In pertinent part, the notes provided:

> In return for this Investment, Borrower (Gary K. Willman d.b.a. "Rightway Realty") Hereby Grants the Investor [(Jim)] an Assignment of Interest in His Life Insurance Policy with Cincinnati Life. Said Assignment will be Released Upon the Repayment of this Investment in Full.

Additionally, every loan had a twelve percent interest rate, along with a default rate of eighteen percent. Jim testified that even when Gary was late on a payment, he never required Gary to pay the eighteen percent interest rate.

Jim stopped providing loans to Gary after Jim's bank terminated his checking account due to suspicious activity in 2019. By that point, Jim had loaned Gary hundreds of thousands of dollars. Gary passed away unexpectedly on April 6, 2020.

Jim contacted the attorney for Gary's estate shortly after Gary's passing and claimed six outstanding loans that totaled about $170,000. On May 13, 2020, Jim

filed a claim in probate, claiming the same six loans he identified to Gary's estate attorney, as well as two additional loans that have since been resolved. The life insurance company paid Jim the proceeds from the policy on May 28, 2020, and Jim retained the full $500,000.

Kelli instituted the present action on July 27, 2020, on a theory of conversion. She claimed that she was the rightful beneficiary of the insurance proceeds after Jim retained sufficient funds to satisfy the outstanding loans. Jim was deposed on May 27, 2021, during which he claimed many more loans were outstanding, bringing the total amount he believed Gary owed him to roughly $500,000.

Trial was held September 1, 2021. Only Jim and Kelli testified. Jim testified that there were eight loans outstanding at the time of Gary's death—the original six he identified at the time of Gary's death, as well as two additional loans valued at $33,000 and $35,500. He claimed that he was entitled to the full proceeds of the life insurance policy based on oral assurances Gary provided him. He further claimed that he was entitled to that amount even if Gary had fully paid back all the loans in full.[1] Kelli, in contrast, claimed that there was no outstanding debt. As a result, she alleged that she was entitled to the full value of the policy.

The district court concluded Jim was owed approximately $173,000, with the rest of the proceeds belonging to Kelli. The court determined that the parties intended the insurance policy to repay only the amount of debt remaining when

[1]Jim's testimony at trial was not entirely clear on this issue, but he appeared to acknowledge that if no sums were due to Jim, Gary would likely have cancelled the assignment and Jim would not have received any proceeds.

Gary defaulted rather than the full policy amount. As part of that determination, the court noted that it did not believe an oral contract had been formed between the parties. The court further found that only the six loans Jim originally identified were outstanding and secured by the insurance policy. Jim appeals.

## II. Standard of Review

We review a district court's interpretation of a contract for correction of errors at law. *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). We are not bound by the district court's interpretation, but if the interpretation was based on extrinsic evidence the findings of the district court are binding on appeal if supported by substantial evidence. *Id.* If there is no relevant extrinsic evidence, the interpretation of ambiguity in a contract is a matter of law for this court. *Id.*

## III. Discussion

Jim contends the district court should have found he was entitled to the full proceeds from the insurance policy. He claims he is entitled to the full value due to the promissory notes executed with each loan, as well as several theories related to oral representations Gary made to him. In the alternative, he claims the district court miscalculated the amount of outstanding debt secured by the policy.

We begin our analysis by interpretating the language included with each promissory note assigning Jim an interest in the life insurance policy. Our supreme court recently summarized our approach to contract interpretation as follows:

> "The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract." The language the parties used is the most important evidence of their intentions, and therefore, we endeavor to give effect to all language of the contract. But "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."

> We rely on the general rules of contract interpretation from the Restatement as guides in the process of interpretation. "The rules do not depend on a determination that there is an ambiguity, but we use them to determine 'what meanings are reasonably possible as well as in choosing among possible meanings.'"

*Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) (alteration in original) (internal citations omitted).

Contrary to Jim's assertions at trial, the promissory notes do not entitle him to the full proceeds of the insurance policy even if Gary had repaid the loans in full. The last sentence, "Said Assignment will be Released Upon the Repayment of this Investment in Full," clearly precludes such an outcome. Therefore, the question remaining for resolution is what amount of the policy Jim can retain. Jim contends that the promissory notes allow him to retain the full policy if Gary had even a single dollar left unpaid on the loans. In contrast, Kelli claims Gary is only entitled to the amount of the debt left unpaid.

We determine the promissory notes only permit Jim to retain the amount of the outstanding debt, not the full policy. The notes themselves are silent as to the amount Jim could retain upon default. Indeed, the notes merely include that Jim had been granted "an assignment"—it does not denote what that assignment entailed. However, the circumstances surrounding the loans demonstrate that the life insurance policy acted as collateral for the loans. Jim testified that he and Gary began executing the promissory notes after Jim became concerned about the amount of money involved in the transactions. Gary provided the life insurance as collateral for the loans to assuage those concerns. Jim conceded at trial that the policy was put in place so that he could be sure "[he] would get the money back."

Jim further testified that he would not have provided the loans had Gary not secured them with the life insurance policy. However, under Jim's interpretation of the contract, the policy would have had limited benefits to him for each subsequent loan he made following the first promissory note. Bank records reflect that Jim would make up to six loans a month. If each individual loan entitled him to the full insurance policy on default, there would be nothing securing any of the other loans once Gary defaulted on a single loan. Given Jim's testimony that the policy was intended to secure him against losses on several loans running concurrently, we do not believe the parties intended the full policy to be paid out on the default of one loan.

Most significantly, the conditional assignment Gary executed provided that Jim would "pay any balance of sum received hereunder from the Company remaining after payment of the then existing liabilities . . . to the person entitled thereto under the terms of the policy had this assignment not been executed." Kelli is listed as the primary beneficiary of the life insurance policy. Therefore, the terms of the conditional assignment directed Jim to provide any remaining value from the insurance policy after his debts had been paid off to Gary's surviving spouse, Kelli. It would make little sense for the assignment to include that language if Jim were entitled to the full value of the policy—there simply could not have been any remaining value to pay out. Thus, the promissory notes limited Jim to the amount of unpaid debt remaining on the loans.

Jim claims that oral agreements he made with Gary allow him to retain the full value of the life insurance policy regardless of the amount of outstanding debt.[2] In particular, Jim claims that Gary told him, "I took out a million dollars policy and it would be just in your name and you do whatever you want with it." The district court rejected this argument, noting, "The Court simply does not believe that Gary intended for James to receive the entire $500,000 regardless of the outstanding balance, if any." The court implicitly found Jim was not credible, explaining that Jim's purported rationale for retaining the full value of the policy as an inducement for further loans made little sense after considering the high interest rate involved with the loans, Gary's history of successful repayment, and the substantial windfall that would occur under Jim's theory. As the trier of fact, the district court is in a substantially better position to weigh credibility. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 182 (Iowa 2010). We are not in a position to contradict such findings. *See id.* Additionally, even taking Jim's testimony at face-value, Gary's statements appear to explain how the collateral would work—Jim need not worry about the risk of loss on the loans because the life insurance policy would repay him upon default. As such, we agree with the district court that Gary did not represent to Jim that he would obtain a million-dollar policy regardless of the amount of debt, if any, outstanding.[3] As such, there was no oral contract.

---

[2] As part of this contention, Jim also makes claims involving promissory estoppel and equitable estoppel.

[3] Given the lack of oral representations made to Jim, his claims for promissory estoppel and equitable estoppel also fail. *See McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532 (Iowa 2015) (describing how promissory estoppel requires the party to prove "a clear and definite oral agreement" (citation omitted)); *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 271 (Iowa 2002) (noting a

The primary fact question, according to the district court, was what amount of debt actually was outstanding at the time of Gary's death. Jim contends the court incorrectly determined that there was about $173,000 in outstanding loans secured by the life insurance policy. He also claims the court improperly used the twelve percent interest rate rather than the eighteen percent default rate provided for in the promissory notes.

As to the interest rate, we determine the court properly used the twelve percent interest rate. A party may waive a contractual provision. "[O]ne way to prove waiver of contract provisions is 'by evidence of a general course of dealing between the parties.'" *Dunn v. Gen. Equities of Iowa, Ltd.*, 319 N.W.2d 515, 516 (Iowa 1982) (citation omitted); *see also* Restatement 2d of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and an opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").[4] It was undisputed at trial that despite late payments on other loans, Jim never required Gary to pay the default rate. Thus, Jim waived the default rate and the district court properly applied twelve percent interest to the outstanding loans secured by the life insurance.

---

required element of equitable estoppel is the opposing party misrepresenting or concealing material facts).

[4] We note that Jim contests the applicability of *Dunn*, noting that it is "inapplicable because it involved the waiver of enforcement of an acceleration clause and not the waiver of default interest." We disagree. *Dunn* itself points out that waiver of contractual rights by the general course of dealings is a rule "applicable to contract rights generally," and is not limited to the specific type of contractual provision being waived. 319 N.W.2d at 517.

We also conclude the district court correctly found that there were six outstanding loans secured by the life insurance policy. These six loans were the same ones Jim initially identified when he contacted the estate's attorney following Gary's death. While Jim contends two other sums ought to be included in the calculations, nothing in the record beyond Jim's testimony indicates that the sums were loans or secured by the life insurance policy.[5] There were no accompanying promissory notes for those values. And despite the significant sums involved in the two purported loans, Jim only identified them around the time of trial. The court correctly calculated that Jim was entitled to $173,966.41 from the life insurance policy.

**AFFIRMED.**

---

[5] The additional two loans raised by Jim are referred to in the record as "check swap" loans and do not contain the additional language to indicate they were secured by the insurance proceeds. We make no determination as to the outcome of these two alleged loans if claimed by Jim as an unsecured creditor of the Gary Willman estate.